[No. S105909. Jan. 5, 2004.]

LYDIA ORTIZ HAGBERG, Plaintiff and Appellant, v.
CALIFORNIA FEDERAL BANK FSB, Defendant and Respondent.

COUNSEL

Vakili & Leus, Sa'id Vakili; and Peter A. Zablotsky for Plaintiff and Appellant.

Gary Williams for ACLU Foundation of Southern California as Amicus Curiae on behalf of Plaintiff and Appellant.

Delia Y. Guevara; Haight, Brown & Bonesteel, Jules S. Zeman; Yocca Patch & Yocca, Mark W. Yocca and Paul Kim and for Defendant and Respondent.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Andrea Lynn Hoch, Chief Assistant Attorney General, James M. Schiavenza, Assistant Attorney General, and Paul T. Hammerness, Deputy Attorney General, as Amici Curiae on behalf of Defendant and Respondent.

Leland Chan and C. Dawn Casey for California Bankers Association and American Bankers Association as Amici Curiae on behalf of Defendant and Respondent.

OPINION

GEORGE, C. J.—■ We granted review in this case to consider whether tort liability may be imposed for statements made when a citizen contacts law enforcement personnel to report suspected criminal activity on the part of another person. As we shall explain, we agree with the trial court, the Court of Appeal, and the great weight of authority in this state in concluding that such statements are privileged pursuant to Civil Code section 47, subdivision (b) (section 47(b)),[1] and can be the basis for tort liability only if the plaintiff can establish the elements of the tort of malicious prosecution.

I

Plaintiff Lydia Ortiz Hagberg, a Hispanic woman, opened an account at a Pasadena branch of California Federal Bank, FSB (Cal Fed). A few months later she appeared at this branch to cash a check made out to her by the commercial institution Smith Barney. She presented her California driver's license, her Cal Fed ATM card, the Smith Barney check, and her Smith Barney account summary, along with the envelope in which she had received the check. The teller, also apparently a Hispanic woman, suspected that the check was a counterfeit and brought it to her supervisor, Nolene Showalter,

---

[1] Statutory references are to the Civil Code unless otherwise indicated.

apparently a person of European descent. Showalter agreed that the check had a suspicious appearance, in that some of the print was "fuzzy and unclear" or "smudged" and part of the address line was missing—features not commonly found on Smith Barney checks. Showalter contacted Smith Barney by telephone, was informed that the check was not valid, and then contacted Cal Fed's corporate security office. The regional security manager, Gary Wood, instructed her to telephone the police, and she did so. A transcript of the telephone call to the police discloses that Showalter explained that Hagberg had attempted to negotiate a counterfeit check. The police dispatcher asked questions concerning the identity and appearance of the person attempting to cash the check, apparently in order to assist the police in determining whom they should contact at the bank. Showalter answered these questions and also volunteered that the bank's corporate security officer "just wants somebody to hang on to her [until] he can check this out. Because our first call to them, they said it was counterfeit . . . . [¶] And we've taken a lot of losses." The dispatcher asked the person's ethnicity, and Showalter answered, "White— well, maybe Hispanic; kind of reddish hair, short."

While Showalter spoke to the police dispatcher, Wood, the bank's regional security manager, himself telephoned Smith Barney and was informed that the check was valid and that the information earlier received by Showalter from Smith Barney was erroneous. This information was relayed to Showalter, who interrupted her statement to the police dispatcher with the news. She informed the dispatcher that Cal Fed no longer required the assistance of the police and that the bank was "getting into trouble here with this." The dispatcher responded that the police were already at the bank, and when Showalter looked up, she could see a police officer approaching Hagberg. Showalter asked the dispatcher if she should tell the police officers to leave, and the dispatcher told her to do so. Showalter stated in her declaration that she "immediately walked over to the teller window as the police officers were approaching the customer" and that she "reached over the teller's desk with [her] hand to catch their attention and told the police we had canceled the call." She stated: "The police, however, proceeded with an investigation and detained the customer." Showalter did not speak to Hagberg.

Hagberg testified at her deposition that a police officer drew her away from the teller's window, spread her legs, patted her down, and handcuffed her. Her handbag was searched, and the officer asked her whether she was in possession of weapons or stolen property and whether she was driving a stolen vehicle. Hagberg testified that, as the police were placing her under arrest, she looked at the Hispanic teller who had been serving her, and that the teller announced to Hagberg that Hagberg "looked like a criminal." Hagberg's ordeal ended 20 minutes later, when she was released. The record contains a transcript of Hagberg's telephone call to Smith Barney, evidently later the same day, in which the Smith Barney representative explained that

Smith Barney had made a mistake in informing Cal Fed that the check was not valid. In this telephone call, Hagberg evidenced distress over her detention.

On September 9, 1999, Hagberg filed a complaint against Cal Fed and 100 unnamed parties as defendants.[2] The complaint alleged seven causes of action, including race discrimination in violation of the Unruh Civil Rights Act (§§ 51, 52.1), false arrest and false imprisonment, slander, invasion of privacy, intentional infliction of emotional distress, and negligence. She claimed humiliation and emotional distress, and sought damages and penalties of $1.6 million for past and future medical expenses and loss of earnings, as well as attorney fees and costs.

Cal Fed filed its answer on October 15, 1999, and a motion for summary judgment on July 27, 2000. In support of its motion for summary judgment, Cal Fed contended that its statements to the police concerning suspected criminal activity by Hagberg were subject to the absolute privilege established by section 47(b). Cal Fed also claimed immunity under federal law, citing title 31 United States Code section 5318(g), part of the so-called safe harbor provision of the Annunzio-Wylie Anti-Money Laundering Act. Cal Fed also claimed that, even if it were not entitled to immunity for privileged communications under state and federal law, Hagberg had not presented any facts evidencing conduct in violation of the Unruh Civil Rights Act. In support of its motion for summary judgment, Cal Fed proffered Showalter's declaration, portions of plaintiff's deposition testimony, copies of Cal Fed's interrogatories and plaintiff's answers to interrogatories, and the transcript of a recording of the telephone conversation between Showalter and the police dispatcher, as noted above.

The evidence indicated that although Hagberg believed that the only explanation for her treatment was racial or ethnic prejudice on the part of bank employees, the only evidence she possessed in support of this theory was the circumstance that she was of Hispanic descent and the facts noted above regarding the treatment she received at the time of the incident. On August 10, 2000, plaintiff filed her opposition to the motion for summary judgment. In support, plaintiff presented additional testimony from her deposition, a transcript of a recordings of telephone calls made during the incident, a photocopy of the questioned check, the Showalter declaration, and a copy of Cal Fed's written loss prevention procedures. Her deposition testimony indicated her belief that the teller's remark that she looked like a criminal could have been motivated only by racial or ethnic prejudice, and added that the check she proffered would not have been questioned at her

---

[2] The complaint also named Primerica Financial Services as a defendant, but because of a settlement entered into between the parties, that entity was not a party to the appeal.

place of business. Her deposition also indicated that one of the police officers who detained her suggested that she complain about her treatment. On August 18, 2000, defendant filed its reply.

Plaintiff filed motions for continuance to permit further discovery, but they were denied. On August 24, 2000, the trial court granted defendant's motion for summary judgment. It explained at the hearing on the motion for summary judgment that the absolute privilege established by section 47(b) applied to Cal Fed's statements to the police concerning suspected criminal activity. It declared: "Although it is subject to abuse, it seems to me the right of a private citizen, or a public citizen for that matter, to contact the police and advise the police of what they suspect to be criminal activity must be absolute and must be without threat of recourse." The court found support for its conclusion in a decision by this court (*Silberg v. Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*)) and also in several Court of Appeal decisions. It noted that there was some disagreement on the point in the Courts of Appeal, but it followed the majority view, reiterating that "public policy would dictate that parties must have [unfettered] access to make police reports." Because it had decided the case on this basis, it declined to reach Cal Fed's claim to immunity under federal law. The court's judgment briefly reviewed the evidence, including evidence plaintiff had offered in opposition to the motion for summary judgment, and stated "[a]fter duly considering the evidence proffered by Plaintiff, the Court does not find any triable issue of fact." Furthermore, it determined: "Defendant's report to police and communications related thereto are privileged pursuant to Section 47(b) of the California Civil Code."

On appeal, the Court of Appeal affirmed the trial court's order granting summary judgment in favor of Cal Fed, agreeing with the lower court that the privilege established by section 47(b) applied to Cal Fed's communication with the police concerning its suspicion that Hagberg was attempting to negotiate a counterfeit check.

The Court of Appeal, like the trial court, began its analysis with this court's decision in *Silberg, supra,* 50 Cal.3d 205, 215–216. The appellate court pointed out that in *Silberg*, we directed that section 47(b) be applied broadly to bar tort actions based on privileged communications, excepting only the tort of malicious prosecution.

The Court of Appeal pointed to the many cases emanating from the Courts of Appeal that hold that the absolute privilege of section 47(b) "shields testimony or statements to officials conducting criminal investigations." These cases, it observed, recognize the importance of ensuring an "open channel of communication" between citizens and the police. With regard to a single

Court of Appeal decision that reached a contrary result (*Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367] (*Fenelon*)), the Court of Appeal observed that *Fenelon* "has not been followed, and has been roundly criticized." The Court of Appeal adopted the view embraced by the majority of appellate court decisions on this point. It observed that under the rule set forth in these decisions, citizens are not entirely unprotected from abuse, because Penal Code section 148.5, subdivision (a), provides that it is a misdemeanor knowingly to make a false crime report to the police.

In response to plaintiff's claim that statements are not subject to an absolute privilege when their utterance violates a statute such as the Unruh Civil Rights Act, the Court of Appeal pointed to other instances in which causes of action defined by statute—statutes carrying out important public policies—also are subject to the privilege established by section 47(b). (Citing, e.g., *Rubin v. Green* (1993) 4 Cal.4th 1187, 1203 [17 Cal.Rptr.2d 828, 847 P.2d 1044].) Further, the Court of Appeal, like the trial court, declined to reach defendant's claim that it (defendant) also was shielded by a privilege established by federal law. Finally, the Court of Appeal concluded that the trial court had not abused its discretion in denying plaintiff's motions for continuance for further discovery.

We granted Hagberg's petition for review to resolve an apparent conflict in the decisions of the Courts of Appeal. Hagberg urges us to adopt the minority view, pointing out that the ability to summon the police to accuse another of a crime is a potent weapon that is subject to abuse and that can cause great injury to reputation and other interests of innocent persons. She also reiterates her claim that even if the privilege is absolute in most instances when a citizen contacts the police to report suspected criminal activity, the Unruh Civil Rights Act, with its important goal of eliminating discrimination on the basis of race and other classifications, creates an exception when the communication violates the provisions of that act.

Cal Fed, for its part, first vigorously maintains that it is entitled to absolute immunity under 31 United States Code section 5318(g)(3), a federal provision that imposes a duty on banks to report suspected criminal activity of a specified nature to law enforcement authorities and, specifically preempting state law, provides absolute immunity for such reports. Cal Fed urges that even if we were to conclude that state law extends only a qualified privilege with respect to plaintiff's claims, state law would be preempted by the more expansive federal immunity provision.

With respect to section 47(b), Cal Fed urges that this court, like the Court of Appeal and the trial court in this case, conclude that the better view is expressed by those Court of Appeal decisions holding that section 47(b)

establishes an absolute privilege for statements made by a citizen who contacts the police to report suspected criminal activity. With respect to plaintiff's Unruh Civil Rights Act claim, Cal Fed contends that, by its terms, the act does not establish an exception to section 47(b). Cal Fed also asserts that even the violation of a constitutional interest sometimes may fail to enjoy a remedy in damages because of certain immunities and privileges, so that it is not anomalous to extend the privilege to communications such as those alleged in the present case.

## II

■  Section 47 establishes a privilege that bars liability in tort for the making of certain statements. Pursuant to section 47(b), the privilege bars a civil action for damages for communications made "[i]n any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to [statutes governing writs of mandate]," with certain statutory exceptions that do not apply to the present case. The privilege established by this subdivision often is referred to as an "absolute" privilege, and it bars all tort causes of action except a claim for malicious prosecution. (See *Kimmel v. Goland* (1990) 51 Cal.3d 202, 209 [271 Cal.Rptr. 191, 793 P.2d 524]; *Silberg, supra,* 50 Cal.3d at p. 216.) Cal Fed contends that its communications to the police in the present case fall within the absolute privilege established by section 47(b).

■  Section 47, subdivision (c) extends a qualified privilege to other communications. Under section 47, subdivision (c), a qualified privilege, that is a privilege that applies only to communications made without malice, applies to "communication[s] . . . to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." (§ 47, subd. (c).) Hagberg contends that Cal Fed's communication to the police at most fell into this category of qualified privilege, so that she should be entitled to establish tort liability if she can demonstrate that the communication was made with malice.

We have explained that the absolute privilege established by section 47(b) serves the important public policy of assuring free access to the courts and other official proceedings. It is intended to " 'assure utmost freedom of communication between citizens and *public authorities whose responsibility is to investigate and remedy wrongdoing.' "* (*Silberg, supra,* 50 Cal.3d at p. 213, italics added.) We have explained that both the effective administration of justice and the citizen's right of access to the government for redress

of grievances would be threatened by permitting tort liability for communications connected with judicial or other official proceedings. Hence, without respect to the good faith or malice of the person who made the statement, or whether the statement ostensibly was made in the interest of justice, "courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings." (*Ibid.*)

■ Although the statute originally was understood as applicable only to the tort of defamation, our cases, beginning with *Albertson v. Raboff* (1956) 46 Cal.2d 375, 382 [295 P.2d 405], have extended the privilege it provides to other potential tort claims. (See *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1163–1165 [232 Cal.Rptr. 567, 728 P.2d 1202].) As noted, the only tort claim we have identified as falling outside the privilege established by section 47(b) is malicious prosecution. (*Silberg, supra,* 50 Cal.3d at p. 216.) Section 47(b), of course, does not bar a criminal prosecution that is based on a statement or communication, when the speaker's utterance encompasses the elements of a criminal offense. (See, e.g., Pen. Code, §§ 118 [perjury], 148.5 [false report of criminal offense].)

■ In its application to communications made in a "judicial proceeding," section 47(b) is not limited to statements made in a courtroom. Many cases have explained that section 47(b) encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit. (See *Rubin v. Green, supra,* 4 Cal.4th at pp. 1194–1195.) As we have said, "it is late in the day to contend that communications with 'some relation' to an *anticipated* lawsuit are not within the privilege." (*Ibid.*) Rather, the privilege applies to "any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom [when] no function of the court or its officers is involved." (*Silberg, supra,* 50 Cal.3d at p. 212; see also *PG&E v. Bear Stearns* (1990) 50 Cal.3d 1118, 1132–1133, 1137 [270 Cal.Rptr. 1, 791 P.2d 587] [the privilege encompasses a private entity's statements that instigate another person or entity to undertake litigation].) We have noted the application of the privilege to communications with " 'some relation to a proceeding that is . . . under serious consideration;' " to " 'potential court actions;' " and to " 'preliminary conversations and interviews related to contemplated action,' " and we also have determined that the privilege applies to communications made, prior to the filing of a complaint, by a person "meeting and discussing" with potential parties the "merits of the proposed . . . lawsuit." (*Rubin v. Green, supra,* 4 Cal.4th at p. 1194–1195.)

■ By the terms of the statute, statements that are made in quasi-judicial proceedings, or "any other official proceeding authorized by law" (§ 47(b)), are privileged to the same extent as statements made in the course of a judicial proceeding. By analogy to cases extending the litigation privilege to statements made outside the courtroom, many cases have held that the official proceeding privilege applies to a communication intended to prompt an administrative agency charged with enforcing the law to investigate or remedy a wrongdoing. As we summarized in *Slaughter v. Friedman* (1982) 32 Cal.3d 149 [185 Cal.Rptr. 244, 649 P.2d 886], "the privilege protect[s] communications to or from governmental officials which may precede the initiation of formal proceedings." (*Id.* at p. 156 [185 Cal.Rptr. 244, 649 P.2d 866], italics omitted.)

In *Kashian v. Harriman* (2002) 98 Cal.App.4th 892 [120 Cal.Rptr.2d 576], for example, the privilege for communications made in connection with "any other official proceeding" was held to apply to a letter urging a division of the Office of the Attorney General to institute an investigation into the propriety of the tax-exempt status being claimed by a health care provider named by the letter writer. In addition, the letter urged that the Attorney General investigate the health care provider for specified alleged unfair business practices; this, too, was found to be covered by the privilege. (*Id.* at pp. 926–927.) In another case, the privilege was found to extend to communications between private parties regarding whether the parties should urge the Attorney General's charitable trust division to investigate the alleged failure of a recording studio to pay royalties that it owed to various charities. The Court of Appeal in that case concluded that the privilege extended to communications between private persons "preliminary to the institution of an official proceeding." (*Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 781–783 [54 Cal.Rptr.2d 830].)

In another example, the court in *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296 [100 Cal.Rptr.2d 437] concluded that the privilege extended to a man's allegedly unfounded and malicious report to the Department of Motor Vehicles that his estranged wife was unfit to drive because of drug use. The court concluded that the "privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings. [Citation.] The privilege extends beyond statements made *in* the proceedings, and includes statements made to *initiate* official action." (*Id.* at p. 1303, italics added.) The court in *Wise* explained its holding by pointing to the public policy served by section 47(b): "An absolute privilege exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing. [Citation.] The privilege is based on '[t]he importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity.' [Citation.]" (*Wise v. Thrifty Payless, Inc., supra,* 83 Cal.App.4th at p. 1303.)

In *King v. Borges* (1972) 28 Cal.App.3d 27 [104 Cal.Rptr. 414], the court held that the privilege extended to a letter written by a lawyer to the state's Division of Real Estate complaining that a real estate agent improperly had refused to pay a refund out of an escrow fund to the lawyer's client. The court observed that the communication was intended to prompt official action by the Division of Real Estate, and was as much a part of that agency's proceedings as a communication made after the agency took official action. The court warned that effective law enforcement would suffer if citizens became reluctant to call upon the government to enforce the law for fear of potential tort liability. In the court's view, the risk of this public harm outweighed the potential for occasional harm to a private interest that would follow from the application of the privilege to such communications. (*Id.* at pp. 31–34.)

Another case applied the privilege in the context of a whistleblower statute that encourages citizens to report waste and malfeasance on the part of governmental authorities. (Gov. Code, § 8547.1.) As the court in *Braun v. Bureau of State Audits* (1998) 67 Cal.App.4th 1382 [79 Cal.Rptr.2d 791], explained, the State Auditor is charged with investigating citizen complaints concerning improper governmental activity and thereafter reporting any improper activity to appropriate enforcement agencies. (Gov. Code, §§ 8547.5, 8547.7.) The Court of Appeal concluded that the Bureau of State Audits' investigation and its report to an enforcement agency constituted an "official proceeding" and were subject to the absolute privilege—*just as initial complaints made by whistleblowers to the State Auditor necessarily would be privileged. (Braun v. Bureau of State Audits, supra,* 67 Cal.App.4th at pp. 1389–1391.)

Numerous additional cases agree that the section 47(b) privilege applies to complaints to governmental agencies requesting that the agency investigate or remedy wrongdoing. (See *Fremont Comp. Ins. Co. v. Superior Court* (1996) 44 Cal.App.4th 867, 876–877 [52 Cal.Rptr.2d 211] [privilege applied to a statement by two worker compensation insurers to the state Department of Insurance and the local district attorney's office accusing a physician of insurance fraud]; *Passman v. Torkan* (1995) 34 Cal.App.4th 607, 616–619 [40 Cal.Rptr.2d 291] [privilege applied to a letter written to the local district attorney's office intended to prompt a criminal prosecution]; *Long v. Pinto* (1981) 126 Cal.App.3d 946, 948 [179 Cal.Rptr. 182] [privilege applied to a physician's letter to the state Board of Medical Quality Assurance accusing another physician of performing unnecessary surgeries, because the letter "was sent to prompt board action and was thus part of an official proceeding"]; *Tiedemann v. Superior Court* (1978) 83 Cal.App.3d 918, 924–926 [148 Cal.Rptr. 242] [privilege applied to communication by a "disgruntled former business associate" to the federal Internal Revenue Service accusing a person of tax fraud]; *Martin v. Kearney* (1975) 51 Cal.App.3d 309, 311 [124

Cal.Rptr. 281] ["official proceeding" privilege extends to parents' letters to a school principal seeking to prompt official action concerning a teacher's poor performance].)

■ By the same token, the overwhelming majority of cases conclude that when a citizen contacts law enforcement personnel to report suspected criminal activity and to instigate law enforcement personnel to respond, the communication also enjoys an unqualified privilege under section 47(b). These cases explain that a statement urging law enforcement personnel to investigate another person's suspected violation of criminal law, to apprehend a suspected lawbreaker, or to report a crime to prosecutorial authorities is shielded from tort liability to the same extent as a similar statement to administrative enforcement agencies. Reasoning that such communications are at least preparatory to "any other official proceeding authorized by law," (*ibid.*) the majority of decisions in the Courts of Appeal have held such statements to be shielded by an absolute privilege. We find these decisions to be persuasive, as we shall explain.

As the Court of Appeal in the present case observed, the leading case in this area is *Williams v. Taylor* (1982) 129 Cal.App.3d 745 [181 Cal.Rptr. 423] (*Williams*). In that case, the Court of Appeal applied the absolute privilege of section 47(b) to statements made by an employer who contacted the police to report suspected theft on the part of an employee and to request that the police conduct an investigation. As a result of the police investigation, the employee was charged with various crimes. Most of the charges ultimately were dismissed, and the employee was acquitted of the remaining charge that went to trial. Thereafter, the employee sued the employer for slander, intentional and negligent infliction of emotional distress, and malicious prosecution.

The Court of Appeal in *Williams* determined that the employee's slander and emotional distress claims failed because the statements to the police were subject to the section 47(b) privilege: "In our view," the appellate court stated, "a communication concerning possible wrongdoing, made to an official governmental agency such as a local police department, and which communication is designed to prompt action by that entity, is as much a part of an 'official proceeding' as a communication made after an official investigation has commenced. [Citation.] After all, '[t]he policy underlying the privilege is to assure utmost freedom of communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing.' [Citation.] In order for such investigation to be effective, 'there must be an open channel of communication by which citizens can call . . . attention to suspected wrongdoing. That channel would quickly close if its use subjected the user to a risk of liability for libel. A qualified privilege is

inadequate under the circumstances. . . . [¶] The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity outweighs the occasional harm that might befall a defamed individual. Thus the absolute privilege is essential.' [Citation] And, since the privilege provided by section 47 [(b)] is absolute, it cannot be defeated by a showing of malice." (*Williams, supra,* 129 Cal.App.3d at pp. 753–754.)

We cited *Williams* with approval in *Slaughter v. Friedman, supra,* 32 Cal.3d 149. In that case we determined that the privilege did *not* apply to communications between a dental insurance plan and a dentist's patients, in which the insurance plan denied claims for assertedly unnecessary work and informed the patients that the insurance company intended to report the dentist to a state dental professional association for possible discipline. These were communications between private parties, they concerned the processing of insurance claims by a private entity, and they were not directed at preparing for or eliciting governmental action. We distinguished these circumstances from those in which the privilege *does* apply, stating that: "The 'official proceeding' privilege has been interpreted broadly to protect communication to or from *governmental* officials which may precede the initiation of formal proceedings. (*Williams v. Taylor* (1982) 129 Cal.App.3d 745, 753 [181 Cal.Rptr. 423] [statements to investigative officers]; *Brody v. Montalbano* (1978) 87 Cal.App.3d 725, 732–733 [151 Cal.Rptr. 206] [communications between parents and school board]; *Tiedemann v. Superior Court* (1978) 83 Cal.App.3d 918, 924–926 [148 Cal.Rptr. 242] [statements to I.R.S. agents investigating tax fraud].)" (*Slaughter v. Friedman, supra,* 32 Cal.3d at p. 156.)

Many other decisions are in accord with *Williams, supra,* 129 Cal.App.3d 745. In *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485 [100 Cal.Rptr.2d 905], for example, the court relied upon *Williams* in determining that the privilege barred a defamation claim based upon an American citizen's communication to Mexican prosecutors seeking the initiation of a criminal investigation by Mexican authorities. The court declared, citing cases dating back to the 1930's, that "[g]enerally, the absolute privilege shields . . . statements to officials conducting criminal investigations." (*Beroiz v. Wahl, supra,* 84 Cal.App.4th at pp. 494–495.) In *Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 112 [80 Cal.Rptr.2d 60], the court held that the absolute privilege extended to an employee's statement to the police that a coworker had threatened the employee with violence. A defamation claim was barred, the court observed, because "Civil Code section 47 gives all persons the right to report crimes to the police, the local prosecutor or an appropriate regulatory agency, even if the report is made in bad faith." (*Ibid.*)

In *Hunsucker v. Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1502–1504 [28 Cal.Rptr.2d 722], in the context of false imprisonment and assault and battery claims, the court found the privilege applicable to a hotel manager's report to the police that a guest had been brandishing a gun in a hotel room. In *Cote v. Henderson* (1990) 218 Cal.App.3d 796, 806 [267 Cal.Rptr. 274], the court determined that the privilege extended to a report made by a woman to the police and the district attorney that a man had raped her. And in *Johnson v. Symantec Corp.* (N.D.Cal. 1999) 58 F.Supp.2d 1107 (*Johnson*), the court applied the privilege to bar a defamation action against a man who reported to the police that a coworker had assaulted him. Applying California law, the federal district court opined that this court would agree with the court in *Williams, supra,* 129 Cal.App.3d 745, that the privilege applied not only to communications made during pending official proceedings, but also to "*preinvestigation* communications intended to trigger official action." (*Johnson, supra,* 58 F.Supp.2d at p. 1110.) The district court pointed to the many lower court cases in accord with *Williams*, to our statement in *Slaughter v. Friedman, supra,* 32 Cal.3d 149, that the official proceeding privilege should be interpreted broadly, and also to our approving citation to *Williams, supra,* 129 Cal.App.3d 745 [181 Cal.Rptr. 423], in the *Slaughter* case. (*Johnson, supra,* 58 F.Supp.2d at pp. 1109–1110, & fn. 3; see also *Forro Precision, Inc. v. International Business Machines* (9th Cir. 1982) 673 F.2d 1045, 1055 [applying the absolute privilege of section 47(b) to communications by an alleged crime victim to the local police].)

One Court of Appeal decision disagreed with these authorities, but its analysis has been rejected in numerous subsequent decisions. In *Fenelon, supra,* 223 Cal.App.3d 1476, a majority of the court determined that a citizen's statement to the police concerning the suspected criminal activity of another person did not concern an "official proceeding." The majority declared that the term "official proceeding" encompasses solely "proceedings 'which [resemble] judicial and legislative proceedings, such as transactions of administrative boards and quasi-judicial and quasi-legislative proceedings . . . .' [Citation.]" (*Id.* at p. 1480.) The primary reason advanced for this conclusion was that it is only in such proceedings that persons accused of wrongdoing possess a certain minimum level of due process protection. (*Id.* at p. 1483.) An administrative proceeding may qualify under section 47(b), the majority stated, when the body possesses factfinding authority and conducts hearings and renders adjudicative judgments based on the application of law to the facts. "In general," the *Fenelon* majority stated, "the absolute privilege under section 47[b] is available only where there is an express statutory authorization for the administrative agency to exercise quasi-judicial power." (*Fenelon,* at p. 1481.) Citing out-of-state authority, the *Fenelon* majority declared that it was better policy to accord only a qualified privilege to communications to the police that are intended to instigate official

action by law enforcement. It quoted a 1978 New York case approvingly: " 'To clothe with absolute immunity communications made to a body acting in other than a quasi-judicial capacity—communications which because of the absence of a hearing may often go unheard of, let alone challenged, by their subject—would provide an unchecked vehicle for silent but effective character assassination . . . .' [Citation.]" (*Id.* at p. 1483.)

The *Fenelon* majority cited a number of California cases in support of its assertion that the unqualified privilege applies solely to statements made in official proceedings in which an administrative or legislative body possesses quasi-judicial power vested in it by statute. The cases cited, however, do not support the proposition that the privilege applies solely when a communication is made *during a hearing* at which the accused person possesses procedural protections, nor do these cases suggest that a communication intended to prompt an administrative agency to investigate wrongdoing would not be privileged. (See *Chen v. Fleming* (1983) 147 Cal.App.3d 36 [194 Cal.Rptr. 913] [privilege applied to a complaint to the State Bar concerning an attorney]; *Imig v. Ferrar* (1977) 70 Cal.App.3d 48 [138 Cal.Rptr. 540] [privilege applied to a citizen's communication seeking an internal affairs investigation of a police officer's alleged misconduct]; *Martin v. Kearney, supra,* 51 Cal.App.3d 309 [privilege applied to parents' complaints to a public school principal about a teacher]; *King v. Borges, supra,* 28 Cal.App.3d 27 [privilege applied to a complaint to the state Division of Real Estate accusing a real estate broker of dishonesty].)

The cases cited do not suggest that, to be privileged, the communication must have been made at the time of a quasi-judicial hearing at which the accused person had an opportunity to be heard. Indeed, they conclude otherwise. In *King v. Borges, supra,* 28 Cal.App.3d 27, for example, the court acknowledged that a request that an agency conduct an investigation into wrongdoing is not a part of the formal pleadings in an administrative action. It pointed out, however, that the privilege that is applicable to "judicial proceedings" is not limited to formal pleadings or statements made in open court. To ensure open channels of communication to governmental agencies, the court applied a similarly broad reading to the "official proceeding" privilege, concluding that it encompassed "a communication to an official administrative agency . . . designed to prompt action by that agency." (*Id.* at pp. 32–34.) In sum, the cases cited by the *Fenelon* court applied the privilege to communications requesting agency investigation of possible wrongdoing—an investigation that, like a police investigation, might never result in any further official action at all or that, like a police investigation, might result in a decision to charge the accused person with some kind of wrongdoing.[3]

---

[3] As one court explained, with reference to the many sister-state decisions cited by the *Fenelon* majority, "eighteen of the nineteen cases merely apply the common law privilege for

We are not persuaded by the majority's analysis in *Fenelon, supra,* 223 Cal.App.3d 1476. As Justice Benke pointed out in her dissent in *Fenelon,* prior case law establishes that the critical question is the *aim* of the communication, not the forum in which it takes place. If the communication is made "in anticipation of or [is] designed to prompt official proceedings, the communication is protected." (*Id.* at p. 1485 (dis. opn. of Benke, J.).) Further, as Justice Benke explained, the narrow approach taken by the *Fenelon* majority to what constitutes an "official proceeding" is contrary to settled authority. (*Id.* at pp. 1485–1486.) The *Fenelon* majority's analysis certainly depended upon a much narrower view of the scope and duration of the privilege in judicial proceedings than we have adopted in recent years. It is well settled that communications may be privileged even when they occur outside any hearing or proceeding at which procedural protections apply. In other words, the judicial proceeding privilege may apply to statements made "outside the courtroom [when] no function of the court or its officers is involved." (*Silberg, supra,* 50 Cal.3d at p. 212; see also *Rubin v. Green, supra,* 4 Cal.4th at pp. 1194–1195; *PG&E v. Bear Stearns, supra,* 50 Cal.3d at pp. 1132–1133, 1137; *Slaughter v. Friedman, supra,* 32 Cal.3d at p. 156.)

Although the *Fenelon* majority pointed to the procedural protections that apply in judicial proceedings or in quasi-judicial administrative enforcement proceedings, it did not explain the many decisions that extend the privilege to communications requesting the *initiation* of investigation that might lead to such proceedings. As these decisions recognize, statements made in *preparation* for or to *prompt* investigation that may result in the initiation of such proceedings fall within the privilege. It is not required that the statement be made during the proceeding itself. A statement to the police that is designed to prompt investigation of crime is not different, in this respect, from statements designed to prompt investigation into the tax-exempt status of a hospital, the failure of an entity to honor a contractual obligation to a charitable trust, the failure of a real estate broker to release funds from escrow, the complaint of a physician that another physician performed unnecessary surgery, or the many other examples noted above of complaints intended to elicit administrative action. Although the administrative action itself, like a criminal trial should one ensue, offers procedural protections to the accused person, there is no basis for concluding that similar protections must be in place at the moment an accusation or complaint is made in order for the privilege to apply.

good faith communication between interested parties . . . or similar case law precedent. While the nineteenth case, [citation], did involve the application of a statutorily created privilege, the possibility of an *absolute* privilege did not arise because the statute at issue explicitly applied only to communications made in 'good faith.' [Citations.] [¶] In none of the nineteen cases was the scope of a statutory privilege for 'official proceeding[s]' discussed." (*Johnson, supra,* 58 F.Supp.2d at p. 1112.)

As for the *Fenelon* majority's reliance upon the procedural protections offered once quasi-judicial administrative proceedings commence, as explained by the federal district court in *Johnson, supra,* 58 F.Supp.2d 1107, when it rejected the *Fenelon* majority's analysis, "[t]he relevant forum . . . for determining the truth of a police report is a criminal trial, whose safeguards go beyond those employed in any quasi-judicial proceeding." (*Id.* at p. 1113.) Finally, the evident fear of the *Fenelon* majority that citizens commonly may manipulate law enforcement personnel and use them as tools in private vendettas seems overstated and exhibits an unwarranted assumption of gullibility on the part of law enforcement personnel and a misplaced lack of confidence in the constitutional and legal process that constrains their exercise of authority.

As noted, subsequent decisions have declined to follow the majority's conclusion in *Fenelon, supra,* 223 Cal.App.3d 1476. (See *Beroiz v. Wahl, supra,* 84 Cal.App.4th at pp. 495–496; *Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1051–1052 [61 Cal.Rptr.2d 58]; *Fremont Comp. Ins. Co. v. Superior Court, supra,* 44 Cal.App.4th at p. 876; *Passman v. Torkan, supra,* 34 Cal.App.4th at pp. 618–619; *Hunsucker v. Sunnyvale Hilton Inn, supra,* 23 Cal.App.4th at pp. 1502–1504; *Johnson, supra,* 58 F.Supp.2d at pp. 1111–1112.) [4]

In the years following the decision in *Williams, supra,* 129 Cal.App.3d 745, and the developing weight of authority adhering to its holding and applying the section 47(b) privilege to various communications intended to instigate official investigation into wrongdoing, the Legislature has amended section 47(b) without indicating disapproval of those cases. (See *Moore v. Conliffe* (1994) 7 Cal.4th 634, 648 [29 Cal.Rptr.2d 152, 871 P.2d 204] [relying upon legislative acquiescence with respect to a claim concerning the application of the section 47(b) privilege to arbitration proceedings].)[5]

---

[4] One decision demonstrates confusion concerning the nature of the disagreement between *Williams, supra,* 129 Cal.App.3d 745, and *Fenelon, supra,* 223 Cal.App.3d 1476, concluding that *Williams* was correct in concluding that a report to the police is privileged under section 47(b) and that *Fenelon* erred in concluding otherwise—but that the privilege nonetheless should be a qualified one. (*Devis v. Bank of America* (1998) 65 Cal.App.4th 1002, 1007–1008 [77 Cal.Rptr.2d 238].) The court in *Devis* relied upon early cases concerning claims of false imprisonment, decisions that we discuss below. (*Post,* at pp. 371–375.)

[5] The dissent contends that we "rel[y] on the 'slim reed' of legislative inaction" and "virtually ignore[] [our] obligation to interpret the statute." (Dis. opn., *post* at p. 379.) Our interpretation of section 47(b), however, relies upon our own broad interpretation of the statute in *Silberg, supra,* 50 Cal.3d 205 and later cases, upon the many decisions that have applied the

■ Furthermore, support for our conclusion that communications are privileged under section 47(b) when they are intended to instigate official governmental investigation into wrongdoing, including police investigation, also can be found in a statute that establishes an *exception* that would be unnecessary under the interpretation offered by plaintiff and the *Fenelon* majority. Section 47.5, enacted the same year that *Williams, supra,* 129 Cal.App.3d 745, was decided, creates a limited exception to section 47(b) that authorizes a defamation action in certain restricted circumstances. It provides that "[n]otwithstanding section 47, a peace officer may bring an action for defamation against an individual who has filed a complaint with that officer's employing agency alleging misconduct, criminal conduct, or incompetence, if that complaint is false, the complaint was made with knowledge that it was false and that it was made with spite, hatred, or ill will." (§ 47.5.) Although courts have debated constitutional issues presented by section 47.5 (see *People v. Stanistreet* (2002) 29 Cal.4th 497, 512 [127 Cal.Rptr.2d 633, 58 P.3d 465] [noting constitutional debate but declining to resolve it]), they have agreed that the statute constitutes an exception to the *general* rule that "[a] communication to an official agency which is designed to prompt action is considered a part of an official proceeding for purposes of Civil Code section 47." (*Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1439–1440 [114 Cal.Rptr.2d 69]; see also *Loshonkohl v. Kinder* (2003) 109 Cal.App.4th 510, 514 [135 Cal.Rptr.2d 114].) Because it is understood that the privilege established by section 47(b) should be given an expansive reach, section 47.5 has been construed narrowly. Actions *other* than for defamation (and the previously excepted action for malicious prosecution), even if they are based upon knowingly false complaints against a peace officer, do not fall within this exception. (*Shaddox v. Bertani* (2003) 110 Cal.App.4th 1406, 1415 [2 Cal.Rptr.3d 808], & fn. 12.) Section 47.5 unquestionably supports the conclusion that the privilege established by section 47(b) applies, in general, to a "communication to an official agency which is designed to prompt action" (*Walker v. Kiousis, supra,* 93 Cal.App.4th at pp. 1439–1440), including a communication to the police that is intended to trigger an investigation into possible criminal activity. [6]

statutory privilege to communications to governmental agencies requesting that the agency investigate or remedy wrongdoing, and upon the specific application of section 47(b) to communications with the police discussed in *Williams, supra,* 129 Cal.App.3d 745 and later cases.

[6] Cal Fed asserts that support for its position can be found in the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164, et seq.), which requires certain persons (and permits other persons) to report to governmental authorities suspected instances of child abuse and specifically establishes that permissive reporters may be held liable for willfully false reports, but that mandatory reporters are shielded by absolute immunity. (Pen. Code, § 11172, subd. (a).) Cal Fed contends that it would have been an idle act for the Legislature to establish a qualified immunity for permissive reporters, as it did in Penal Code section 11172, subdivision (a), if Hagberg were correct that section 47 itself establishes at most a qualified immunity for citizen

It has been urged that the enactment of Penal Code section 148.5, imposing a criminal penalty upon any person who knowingly gives a false report of a crime to any law enforcement officer or district attorney, indicates the

reports of criminal activity. (Accord, *Johnson, supra,* 58 F.Supp.2d at p. 1111.) In response, it has been objected that the absolute privilege for mandatory reporters that the Legislature established in Penal Code section 11172, subdivision (a) would have been unnecessary if Cal Fed were correct that section 47(b) establishes an absolute privilege for citizen reports to the police concerning criminal activity. As evidence that our interpretation of section 47(b) does not comport with legislative intent, the dissent also refers to a similar statutory scheme that imposes new duties on certain persons to report instances of "physical abuse, abandonment, isolation, financial abuse, or neglect" of an elder or dependent adult (Welf. & Inst. Code, § 15630, subd. (b)) to specified state or local agencies or to law enforcement. The dissent indicates that the qualified privilege for permissive reporters established by these provisions demonstrates legislative distaste for false reports to the police concerning criminal activity, as well as the Legislature's general conclusion that "reports to police must be made in good faith in order to receive immunity." (Dis. opn., *post* at p. 379.) The dissent adds that there would have been no need to provide absolute immunity for mandated reporters under these statutory schemes if the Legislature intended section 47(b) to be interpreted as the *Williams* decision concluded it should be. The dissent also suggests that, if these provisions constituted an exception to a general rule of privilege, the Legislature would have located them in section 47(b) itself, along with the other enumerated exceptions that appear there.

There is evidence that in enacting the child abuse reporting provisions, the Legislature understood that the *general* rule was that reports to the police concerning criminal activity were privileged. As noted by Cal Fed and the court in *Johnson, supra,* 58 F.Supp.2d at pages 1110–1111, it would have been unnecessary to provide for qualified immunity for permissive reporters if the dissent's interpretation of section 47(b) were the correct one. Further, in 1981, while the Legislature was considering a related measure that added section 48.7 to the Civil Code, the Legislative Counsel's digest to the bill explained that under existing law, a person who is criminally charged with child abuse may bring a civil action for libel or slander against "the minor, a parent or guardian of the minor, or a witness" *except that* "there is no liability for libel or slander based on a privileged communication, including a communication intended to initiate or further an official proceeding *such as a criminal prosecution.*" (Legis. Counsel's Dig., Assem. Bill No. 42 (1981–1982 Reg. Sess.) 4 Stats. 1981, Summary Dig., pp. 73–74, italics added.)

On balance, however, it would be a mistake to rely too heavily on Penal Code section 11172 in resolving the more general issue of the meaning and proper application of section 47(b). Penal Code section 11172 was part of a comprehensive scheme in which the Legislature sought to increase substantially the reporting of a specific type of crime, but at the same time to provide potential subjects of such increased reporting with explicit civil protection against malicious false reports. (See *Stecks v. Young* (1995) 38 Cal.App.4th 365, 371 [45 Cal.Rptr.2d 475]; *Storch v. Silverman* (1986) 186 Cal.App.3d 671, 678–680 [231 Cal.Rptr. 27] [describing the Legislature's attempt to increase reporting by immunizing mandated reporters, but at the same time to prevent a vindictive spouse or neighbor from making a knowingly false report by limiting immunity for permissive reporters].) Such an exceptional and comprehensive scheme, in which the Legislature has balanced conflicting interests, does not reflect an attempt by the Legislature to deal generally with the subject of the potential civil liability, if any, faced by persons who report crime to the police. It is evident that the same conclusion applies to the comprehensive scheme for elder abuse reporting that is noted by the dissent.

The dissent also refers to Education Code section 48902, part of a chapter of the Education Code regulating pupil rights and responsibilities and, specifically, part of an article of that code regulating suspension and expulsion procedures. The provision in question requires school principals and their designees to report specified criminal activity on the part of students to law

Legislature's belief that false reports to the police should not be protected by an absolute privilege. In past cases in which we recognized an absolute privilege under section 47(b), however, we have *relied* upon similar criminal sanctions in support of our expansive view of the privilege in civil actions. In *Silberg, supra,* 50 Cal.3d 205, for example, we pointed out that although the absolute privilege almost entirely removes civil litigation as a deterrent against false or malicious communications, "in a good many cases of injurious communications, other remedies aside from a derivative suit for compensation will exist and may help deter injurious publication during litigation. Examples of these remedies include criminal prosecution for perjury . . . or subornation of perjury . . . ." (*Id.* at pp. 218–219.)

Concern that Penal Code section 148.5 provides an inadequate bulwark against false and malicious communications to the police seems overstated. We note the absence of any indication that such malicious communications present a widespread problem. As prior cases have stressed in interpreting section 47(b), the broad application of the privilege serves the important public interest of securing open channels of communication between citizens and law enforcement personnel and other public officials charged with investigating and remedying wrongdoing.

In support of her claim that Cal Fed's communication with the police in the present case was not subject to the absolute privilege of section 47(b), plaintiff directs our attention to early cases discussing the tort of false imprisonment.

■  That tort and the crime of false imprisonment are defined in the same way. (*Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 715 [30 Cal.Rptr.2d 18, 872 P.2d 559].)[7] We have explained that " '[t]he tort of false imprisonment is

---

enforcement authorities in connection with ordering the suspension or expulsion of a student for such activity, and it supplies qualified civil and criminal immunity for doing so. The report required by this statute is to be made by a supervisory public employee as an incident of the employee's official duty to discipline students. The principal who is required to report is not thereby seeking police intervention; indeed, it appears that in most instances the report to law enforcement will occur only subsequent to the decision to suspend or expel a decision that is the product of a formal or informal due process hearing. Thus, the school principal's situation is quite distinct from that facing a person who seeks to prompt police intervention or assistance, and this statute does not supply any indication of legislative intent with respect to the application of section 47(b). Again, if the dissent were correct that section 47 supplies only a qualified privilege for reports of criminal activity, it is difficult to understand why the Legislature found it necessary to provide for a qualified privilege under Education Code section 48902.

[7] False imprisonment consists of the unlawful violation of the personal liberty of another person; a false arrest is merely one way in which a false imprisonment may be accomplished—the two are not separate torts. (5 Witkin, Summary of Cal. Law (9th ed.1988) Torts, § 378, pp. 463–464.)

the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time . . . .' [Citation.] A person is falsely imprisoned 'if he is wrongfully deprived of his freedom to leave a particular place by the conduct of another.' " (*Molko v. Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1123 [252 Cal.Rptr. 122, 762 P.2d 46].)

In support of her claim that a knowingly false or malicious report to the police accusing another person of criminal activity may give rise to civil liability, plaintiff relies on *Miller v. Fano* (1901) 134 Cal. 103 [66 P. 183] (*Miller*). In that case, defendant Place, a San Diego police officer, received a telegram from a Los Angeles police officer directing him to arrest one Frank Kuhn, and directing him to consult defendant Fano for further information. Fano was a man who traded in railroad tickets. After learning that a ticket he had bought from Kuhn was forged, Fano tentatively identified Miller to Place, the police officer, as the man who had sold him the questioned ticket. Place arrested Miller without a warrant, believing him to be Kuhn. Miller later was re leased and secured a judgment against Place and Fano.

In our decision in *Miller, supra,* 134 Cal. 103, we upheld a false imprisonment verdict against Place, the police officer, concluding that he had acted "with gross carelessness" because he failed to investigate Miller's protestations that he was not Kuhn. (*Id.* at p. 108, 66 P. 183.)

As for Fano's liability, we acknowledged in *Miller, supra,* 134 Cal. 103, that a person may be liable for false imprisonment even if he or she did not personally confine the plaintiff, but rather aided and abetted in an unlawful arrest by encouraging, directing, or assisting a police officer to make the unlawful arrest. We went on to conclude that Fano had *not* encouraged or directed the concededly unlawful arrest of Miller, observing that it was the duty of every citizen to cooperate with the police in their investigation of crime and to provide information to investigating officers. Fano merely fulfilled this duty. In language relied upon by plaintiff in the present case, we suggested that a person *would* aid and abet an unlawful arrest if he or she should "willfully identify the wrong man as being the criminal, for the purpose of having him arrested and prosecuted . . ." (*id.* at p. 107), but we denied that an "honest mistake" such as appeared in the case before us could be the basis for a defendant's liability as an instigator or aider and abettor of a false imprisonment. (*Ibid.*) Rather, when a person merely conveys information to the police " 'leaving it with the constable to act or not, as he thought proper . . . then the defendant will not be liable . . . .' " (*Ibid.*)

Plaintiff also refers us to *Turner v. Mellon* (1953) 41 Cal.2d 45 [257 P.2d 15] (*Turner*). In *Turner*, again the question was whether the defendant was liable as one who had assisted in bringing about a police officer's unjustified

arrest. Mellon, a Western Union employee, had been robbed several times at his place of employment. He observed plaintiff Turner behaving suspiciously outside his office, telephoned the police, and stated his suspicion that Turner was the robber. Mellon tentatively identified Turner as such to the police. Turner was arrested, but soon was released. We noted that an individual is not liable for false imprisonment unless he or she has " 'taken some active part in bringing about the unlawful arrest' " by the police. There is no liability if, " 'acting in good faith,' " he or she simply furnishes information leading to an arrest. (*Id.* at p. 48.) Although not confronted with a case in which bad faith was alleged, we pointed out how unjust and injurious to the public interest it would be to impose liability for honest mistakes. We concluded that the defendant, though he had given mistaken information leading to the arrest, had not taken an " 'active part in bringing about the unlawful arrest.' " (*Ibid.*) Defendant's conduct "as a matter of law, did not amount to participation in the arrest." (*Id.* at p. 49.)

These cases, however, did not mention, much less analyze, the privilege established by section 47(b). They explored the limits of the common law tort of false imprisonment and the potential for liability as an aider and abettor of an unlawful arrest by police officers. The cases did not consider the issue in the context of a proceeding in which bad faith actually was alleged. The cases also did not distinguish between malicious *conduct* of a citizen that aided or promoted a peace officer's unlawful arrest, which might support liability, and pure *communication*, which would be protected by the statutory privilege. (See *Kimmel v. Goland, supra,* 51 Cal.3d at p. 211 [distinguishing injury from "noncommunicative conduct" from injury arising from "communicative acts"].) They did not consider whether a cause of action for false imprisonment based upon pure communication should be permitted even though a claim for *defamation* or any other tort save malicious prosecution would be prohibited by section 47(b). As we often have stated, cases are not authority for propositions not considered. (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1268 [48 Cal.Rptr.2d 12, 906 P.2d 1112].)

Moreover, the cases predated the expansion of the privilege that began with *Albertson v. Raboff, supra,* 46 Cal.2d 375, and that led to the broad interpretation established in *Silberg, supra,* 50 Cal.3d 205, and other cases. The early cases upon which plaintiff relies were decided before this court explored the broad reach of the privilege established by section 47(b) and explained that it applies not only to defamation, as earlier had been understood, but to all tort actions that seek to impose liability based upon a covered communication, with the exception of malicious prosecution. As we have cautioned, the privilege cannot be defeated by providing a new label for the alleged wrong. (*Rubin v. Green, supra,* 4 Cal.4th at p. 1203.)

As discussed above, in *Silberg, supra,* 50 Cal.3d 205, and later cases, we explained that section 47(b) operates to bar civil liability for any tort claim based upon a privileged communication, with the exception of malicious prosecution, whose requirements include malice, lack of probable cause, and termination in the plaintiff's favor. (*Silberg, supra,* 50 Cal.3d at pp. 215–216; see also *Rubin v. Green, supra,* 4 Cal.4th at p. 1194; *Kimmel v. Goland, supra,* 51 Cal.3d at p. 209.) As we explained, "[m]alicious prosecution actions are permitted because '[t]he policy of encouraging free access to the courts . . . is outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.' " (*Silberg, supra,* 50 Cal.3d at p. 216.) Under plaintiff's theory, however, we would be forced to abandon this well-settled rule and add the tort of false imprisonment as a further exception, even though proof of a termination in plaintiff's favor would not be required. Plaintiff has not supplied an adequate justification for taking this step.

For all these reasons, the cases relied upon by plaintiff do not constitute authority for the proposition that, under the contemporary interpretation of section 47(b), an absolute privilege does not exist, shielding a citizen's report to the police concerning suspected criminal activity of another person. (Accord, *Beroiz v. Wahl, supra,* 84 Cal.App.4th at pp. 495–496, fn. 6.)

Plaintiff also points to the decision of the Court of Appeal in *DuLac v. Perma Trans Products, Inc.* (1980) 103 Cal.App.3d 937, 941 [163 Cal.Rptr. 335]. In that case the Court of Appeal, reviewing the case on demurrer, determined that the plaintiff had failed to adequately allege a cause of action for false imprisonment but, relying on the early cases noted above, the court stated that providing false information to the police in bad faith in order to procure an arrest could form the basis for liability for false imprisonment. This decision is based on our early cases, does not discuss section 47(b), and does not consider how its conclusion possibly could be reconciled with our current view of the broad scope of the privilege established by that statute. (Accord, *Beroiz v. Wahl, supra,* 84 Cal.App.4th at pp. 495–496, fn. 6.)[8]

Plaintiff next contends that even if we conclude that section 47(b) generally provides an absolute privilege, section 47(b) should not be interpreted to bar liability when it is alleged that a business establishment's communication to the police concerning suspected criminal behavior was motivated by racial or ethnic prejudice and therefore constituted unlawful discrimination by the business establishment in violation of the Unruh Civil Rights Act

---

[8] To the extent that language in *Miller v. Fano, supra,* 134 Cal. 103, *Turner v. Mellon, supra,* 41 Cal.2d at p. 46, and *DuLac v. Perma Trans Products, Inc., supra,* 103 Cal.App.3d 937, is inconsistent with our opinion in the present case, it is disapproved.

(§ 51 et seq.), an enactment that provides for equal "accommodations, advantages, facilities, privileges, or services in all business establishments" without regard to characteristics such as race, ancestry, or place of national origin. (§ 51, subd. (b).) Although plaintiff alleged in her complaint that Cal Fed had denied her services on the basis of her race or ethnicity and that the branch where she presented the check had an informal policy of singling out persons of certain racial or ethnic backgrounds as "inherently suspicious," plaintiff's deposition testimony, which was introduced in connection with the summary judgment motion, demonstrates that plaintiff's claim primarily was based on inferences plaintiff subjectively drew from her experience on the day she was detained, inferences that appear to have been refuted by the specific evidence Cal Fed presented with regard to its employee's telephone conversations with Smith Barney and the police, and Cal Fed's prompt efforts to end the police intervention once the mistake had been identified. Because our review of the record raises a serious question whether the evidence presented in support of and in opposition to the summary judgment motion was sufficient even to raise a triable issue of fact on the question whether Cal Fed or its employees were motivated by racial or ethnic prejudice in their treatment of plaintiff or followed a policy of singling out persons of certain races or ethnic backgrounds for discriminatory treatment, we have concluded that this is not an appropriate case in which to resolve the broad legal question whether proof that a business establishment has called for police assistance (or has a policy of calling for police assistance) based on racial or ethnic prejudice could give rise to liability under the Unruh Civil Rights Act notwithstanding the provisions of section 47(b). (See Cal. Rules of Court, rule 29(b)(3) [on review, this court "need not decide every issue the parties raise or the court specifies"].)

Because we conclude that judgment correctly was entered in Cal Fed's favor on the basis of the privilege provided by section 47(b), we need not reach Cal Fed's assertion that it is shielded under the immunity established by federal banking law. (See 31 U.S.C. § 5318(g).)

### III

For the foregoing reasons, the judgment of the Court of Appeal is affirmed.

Kennard, J., Chin, J., and Moreno, J., concurred.

**BROWN, J.,** Dissenting.—I respectfully dissent. Nothing in the statutory language of Civil Code section 47, subdivision (b) (section 47(b))[1] supports the conclusion that reports of suspected criminal activity are absolutely privileged. Rather, consideration of the common law in California and the great weight of authority in our sister states, the Legislature's treatment of reports to police in other statutory schemes, its criminalization of false reports, and sound public policy all demonstrate that reports of suspected criminal activity are only qualifiedly privileged.

Section 47(b) was enacted in 1872, and its relevant language has existed since an 1873–1874 amendment. Not until 1982, however, was it ever applied to reports to police. (*Williams v. Taylor* (1982) 129 Cal.App.3d 745, 753–754 [181 Cal.Rptr. 423] (*Williams*).) For more than a century prior to *Williams*, the citizens of California reported crimes to police, and there is no evidence they were hesitant to do so because of the common law rule that such reports were subject to only a qualified privilege. (*Turner v. Mellon* (1953) 41 Cal.2d 45, 48 [257 P.2d 15] (*Turner*) ["citizens who have been criminally wronged may, without fear of civil reprisal for an honest mistake, report to the police . . . the facts of the crime and in good faith" identify the perpetrator]; *Hughes v. Oreb* (1951) 36 Cal.2d 854, 858–859 [228 P.2d 550] (*Hughes*) [a person is not liable for false imprisonment "if, acting in good faith, he merely gives information to the authorities"]; *Miller v. Fano* (1901) 134 Cal. 103, 107 [66 P. 183] (*Miller*) ["it would be a hard and unjust law that would hold a party responsible in damages for false imprisonment for an honest mistake as to the identity of a party"]; *Du Lac v. Perma Trans Products, Inc.* (1980) 103 Cal.App.3d 937, 942 [163 Cal.Rptr. 335] [defendant may be liable for false imprisonment when he knowingly gives the police false or materially incomplete information of a nature that could be expected to stimulate an arrest].)

---

[1] Section 47(b) and subdivision (c) provide, "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, except . . . [¶] (1) [in inapplicable situations involving certain marital dissolution or legal separation proceeding allegations] . . . . [¶] (2) . . . any communication made in furtherance of an act of intentional destruction or alteration of physical evidence undertaken for the purpose of depriving a party to litigation of the use of that evidence, . . . [¶] (3) . . . any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy, . . . [¶] (4) . . . [or a] recorded lis pendens [which] identifies an action previously filed with a court of competent jurisdiction which affects the title or right of possession of real property . . . . [¶] (c) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." (§ 47, subds. (b)(1)–(4), (c).)

Indeed, plaintiff asserts, and the majority does not dispute, that the overwhelming weight of authority in the rest of the country is that a qualified, not absolute, privilege applies to reports to police. While the majority dismisses this authority on the ground that cases from our sister states do not discuss statutes with language similar to that of section 47(b), the majority does not in fact rely on the language of section 47(b) in reaching its conclusion regarding the scope of immunity for reports to police. Rather, it relies primarily on case law interpreting section 47(b), which in turn relies solely on the public policy consideration that citizens need open channels of communication with the police.

Typically when construing a statute, we seek to determine the Legislature's intent. Here, the majority virtually ignores its obligation to interpret the statute. Rather, it relies on the "slim reed" of legislative inaction (*Quinn v. State of California* (1975) 15 Cal.3d 162, 175 [124 Cal.Rptr. 1, 539 P.2d 761]) to justify its policy preference, noting that while the Legislature has amended section 47 in other respects following *Williams*, it has not abrogated that decision.[2] (Maj. opn., *ante*, at p. 369.) That inaction tells us nothing useful, however, since *Fenelon v. Superior Court, supra*, 223 Cal.App.3d 1476, which disagreed with *Williams*, has also existed for 13 years without any legislative response. Moreover, while the relevant language of section 47(b) has existed since 1874, thus predating this court's decisions in *Turner, supra*, 41 Cal.2d 45, *Hughes, supra*, 36 Cal.2d 854, and *Miller, supra*, 134 Cal. 103, which the majority construes as inconsistent with section 47(b), the section has never, in all of those decades, been amended to respond to these cases.

By failing to examine legislative intent, the majority overlooks the critical fact that the Legislature has already restricted the open channels of communication so central to the majority's position. In other words, however much courts may desire on public policy grounds that all reports to police be absolutely immunized, the fact of the matter is they are not. Rather, in at least three circumstances that arise with everyday frequency, the Legislature has determined that reports to police must be made in good faith in order to receive immunity.

---

[2] The majority further states that this court "cited *Williams* with approval in" *Slaughter v. Friedman* (1982) 32 Cal.3d 149, 156 [185 Cal.Rptr. 244, 649 P.2d 886]. (Maj. opn., *ante*, at p. 365.) It fails to mention, however, that a short time after the decision in *Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476 [273 Cal.Rptr. 367], we acknowledged the conflict between *Fenelon* and *Williams* but "express[ed] no opinion on the merits of the controversy." (*Lubetzky v. State Bar* (1991) 54 Cal.3d 308, 317, fn. 7 [285 Cal.Rptr. 268, 815 P.2d 341].) By acknowledging that a controversy existed, we undermined any suggestion that our citation to *Williams, supra*, 129 Cal.App.3d 745, in *Slaughter, supra*, 32 Cal.3d at page 156, constituted a blanket approval of that opinion.

For example, Penal Code section 11172, subdivision (a) (section 11172(a)), enacted in 1980, bars civil and criminal liability of statutorily mandated reporters of child abuse or neglect under the Child Abuse and Neglect Reporting Act. However, section 11172(a) contemplates such liability for any other person making such a report if "it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report, and any person who makes a report of child abuse or neglect known to be false or with reckless disregard of the truth or falsity of the report is liable for any damages caused." Welfare and Institutions Code section 15634, subdivision (a) (section 15634(a)), enacted in 1985, or several years after *Williams*, contains a similar provision for reports of elder or dependent-adult abuse. The purpose of both of these sections is to *increase* reporting of child, elder, and dependent-adult abuse, crimes that depend on secrecy and the helplessness of their victims for their commission. Yet even under these circumstances, the Legislature has deemed it appropriate to preserve only a qualified privilege for nonmandated reports. It seems unlikely the Legislature would accord only a qualified privilege for those individuals who may be the only voice for reporting crimes against the most vulnerable of victims, but grant absolute immunity to those unsympathetic individuals who falsely report other types of crimes.

Moreover, we are compelled to read the statutes as a whole, and Penal Code section 11172(a) and Welfare and Institutions Code section 15634(a) undertake to provide absolute civil immunity for reports to police by mandated reporters. If Civil Code section 47(b) already provided absolute civil immunity for mandated reporters of these suspected crimes, there would be no reason for the Legislature to accord them such protection in Penal Code section 11172(a) and Welfare and Institutions Code section 15634(a). We do not assume the Legislature engages in idle or superfluous acts. (*In re J.W.* (2002) 29 Cal.4th 200, 210 [126 Cal.Rptr.2d 897, 57 P.3d 363].)

In addition, in several other instances when the Legislature has been dissatisfied with case law interpretation of section 47(b), it has amended section 47(b) to create exceptions to its absolute immunity. Thus, for example, section 47(b) contains exceptions for "any communication made in furtherance of an act" of spoliation of evidence and "any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy." (§ 47(b)(2), (3).) It therefore seems likely that if section 47(b) were intended to give absolute immunity for reports to police, the Legislature would have simply amended Civil Code section 47(b) to provide that false reports of child, elder, or dependent-adult abuse by nonmandated reporters receive only qualified immunity, rather than creating an absolute immunity for mandated reporters and a qualified immunity for nonmandated reporters in Penal Code section 11172(a) and Welfare and Institutions Code section 15634(a).

The majority relies on the public policy of "open channels" of communication between citizens and police to support its interpretation that section 47(b) grants absolute immunity to reports of suspected criminal activity to the police. (Maj. opn., *ante*, at p. 372.) However, the majority's rule means that some reports to police are subject to a qualified privilege while others, after today, are entitled to an absolute privilege. Therefore if the average citizen believed a report to the police was always absolutely privileged, that belief would be incorrect. It is not clear how such an unpredictable standard encourages such reports or fosters open channels of communication.

Penal Code section 11172(a) and Welfare and Institutions Code section 15634(a) are not the only statutes of their kind. Subdivisions (a) and (b) of Education Code section 48902 require the principal of a school, or the principal's designee, in connection with suspending or expelling a student, to notify law enforcement of any acts of the pupil that may constitute certain criminal activity. Subdivision (d) of Education Code section 48902 provides, "A principal, the principal's designee, or any other person reporting a known or suspected act described in subdivision (a) or (b) is not civilly or criminally liable as a result of making any report authorized by this article unless it can be proven that a false report was made and that the person knew the report was false or the report was made with reckless disregard for the truth or falsity of the report."

Under the majority's interpretation, a principal, a principal's designee, or any other person reporting the alleged commission of a crime delineated in Education Code section 48902 receives only a qualified immunity, but if any other type of crime is reported, absolute immunity is now conferred. I am unwilling to accept that the Legislature intended such arbitrary treatment of a school official's or other person's actions.

The language of Education Code section 48902, subdivision (d), was added in 1988, or long after *Williams, supra,* 129 Cal.App.3d 745. While it is conceivable the Legislature wanted to create an exception from any absolute immunity under Civil Code section 47(b) for a school official's or other person's reports to the police that were intentionally or recklessly false, it is more reasonable to conclude the Legislature was either creating immunity where none existed before or modifying an existing qualified privilege to address recklessness. Moreover, unlike Penal Code section 11172(a) , which the majority dismisses as a part of a comprehensive statutory scheme, Education Code section 48902 stands alone. (Maj. opn., *ante*, at pp. 370–372, fn. 6.) As more and more such statutes appear, the claim that Civil Code section 47(b) confers absolute immunity for reports to police becomes even more suspect. Why would the Legislature continue to create separate statutory schemes to address immunity for reports to police if a comprehensive scheme has existed since 1874?

Nor, contrary to the majority's assertion, does Civil Code section 47.5 "unquestionably support[] the conclusion that the privilege established by section 47(b) applies, in general, to a 'communication to an official agency which is designed to prompt action' . . . including a communication to the police that is intended to trigger an investigation into possible criminal activity." (Maj. opn., *ante*, at p. 370, fn. omitted.) Section 47.5 addresses complaints *against*, not *to*, a peace officer that are filed with the peace officer's employing agency. Such a complaint inevitably invokes an administrative process according the officer notice, due process, and other attendant protections not present for the average citizen when a report of the citizen's suspected criminal activity is made *to* police.

Moreover, in concluding section 47(b) contains an absolute privilege for reports to police, the majority omits mention of several significant limitations on that privilege. Thus, while section 47(b) "bars certain tort causes of action which are predicated on a judicial statement or publication itself, the section does not create an evidentiary privilege for such statements. Accordingly, when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the individual acted with the requisite intent." (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168 [232 Cal.Rptr. 567, 728 P.2d 1202] [section 47(b) "would not preclude [plaintiff] from making evidentiary use of defendants' statements during negotiations to prove the intent with which defendants' conduct was undertaken"].) In addition, "republications to nonparticipants in the action are generally not privileged under section 47(2) [now section 47(b)], and are thus actionable unless privileged on some other basis." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 219 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*).) Finally, as the majority does note in passing, section 47(b) applies only to communications, not conduct. (Maj. opn., *ante*, at p. 374; *Kimmel v. Goland* (1990) 51 Cal.3d 202, 205, 212 [271 Cal.Rptr. 191, 793 P.2d 524] [act of illegally taping telephone conversation not covered by section 47(b)].)

In addition, Penal Code section 148.5 makes it a misdemeanor to knowingly give a false report of a crime to a peace officer, and Penal Code section 118.1 makes it a crime for a peace officer to knowingly and intentionally make a false statement regarding a material matter in a report. Thus, unlike most of the prelitigation communications to which the absolute immunity of Civil Code section 47(b) has been extended, false reports to police constitute a crime. The ramifications for a false investigation and arrest can be enormous, and the Legislature clearly abhors such false reports.

In response, the majority notes that perjury is also criminally sanctioned, but because it acts as a deterrent to injurious publications during litigation, the existence of the perjury sanction supported this court's expansive interpretation of section 47(b) in *Silberg*. (Maj. opn., *ante*, at p. 372, citing *Silberg* 50 Cal.3d at pp. 218–219.) However, when perjury occurs during a trial, the victim of that perjury enjoys many attendant protections, such as testimony under oath, vigorous cross-examination informed by pretrial discovery, and rebuttal witnesses, that are not present with the filing of a police report.

The majority asserts that statements reporting suspected criminal activity to police "can be the basis for tort liability . . . if the plaintiff can establish the elements of the tort of malicious prosecution." (Maj. opn., *ante*, at p. 355.) Of course, this is of no assistance to plaintiffs against whom charges are never brought, as in this case, and may be of little assistance when charges are dropped before trial, as in the companion case of *Mulder*. (*Mulder v. Pilot Air Freight* (2004) 32 Cal.4th 384, 386 [7 Cal.Rptr.3d 828,81,P.3d 264], [the plaintiff alleged the defendants acted with malice in supplying information to police, leading to his arrest and numerous court appearances prior to dismissal of charges].) That is because dismissal of criminal charges does not, by itself, constitute a favorable termination for the purpose of establishing malicious prosecution. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 421, 422, pp. 505–507; see *Eells v. Rosenblum* (1995) 36 Cal.App.4th 1848, 1854–1856 [43 Cal.Rptr.2d 323].) Rather, malicious prosecution generally requires the victim of the false accusation to establish that the accusation resulted in a criminal proceeding that was terminated in his favor, i.e., in a manner inconsistent with the accused's guilt. (5 Witkin, *supra*, Torts, §§ 421, 422, pp. 505–507.) Moreover, the majority states that making false imprisonment an "exception" to the absolute privilege under section 47(b) would mean that "proof of a termination in plaintiff's favor would not be required," as it is in a malicious prosecution action. (Maj. opn., *ante*, at p. 375.) At least one case has stated, however, that "[f]alse imprisonment and malicious prosecution are mutually inconsistent torts." (*Cummings v. Fire Ins. Exchange* (1988) 202 Cal.App.3d 1407, 1422 [249 Cal.Rptr. 568].)

The ramifications of an intentionally false report of suspected criminal activity to police are enormous. Citizens arrested pursuant to such a report will be stigmatized, and forever thereafter have to note the arrest on job, credit, and housing applications. Assertions that the charges were dropped, and of one's actual innocence, will likely fall on deaf ears. Under the majority's conclusion today, such falsely accused individuals will have no opportunity to clear their name, or seek compensation for economic loss in defending the charges or loss to their reputation. In the absence of clear support from either the language or the history of section 47(b), this court should not approve absolute civil protection for such destructive and criminal

communications conduct. Rather, it should conclude reports to police are subject to a qualified privilege under either section 47, subdivision (c), or extant common law.

The Legislature has not hesitated to amend section 47(b) when courts have misinterpreted its provisions. I urge the Legislature to do so here.

Baxter, J., and Werdegar, J., concurred.