[No. F049069. Fifth Dist. Sept. 10, 2007.]

STEPHEN T. CHABAK, Plaintiff and Respondent, v.
ERICA C. MONROY, Defendant and Appellant.

1504

### COUNSEL

Magill Guzman Magill, Charles F. Magill and Laura Guzman Magill for Defendant and Appellant.

Stephen T. Chabak, in pro. per., for Plaintiff and Respondent.

### OPINION

**CORNELL, J.**—Erica C. Monroy reported to police that she had been touched inappropriately by Stephen T. Chabak, a physical therapist. She claimed the event occurred a few months before her 18th birthday. The police investigated the incident, but no charges were filed by the district attorney's office.

Chabak responded by filing a complaint against Monroy, seeking damages for what he termed a false report to the police. Monroy moved to strike the complaint pursuant to the provisions of Code of Civil Procedure section 425.16 (hereafter section 425.16). The trial court denied the motion; Monroy appealed.

Resolution of this appeal requires that we reconcile the litigation privilege found in Civil Code section 47, subdivision (b) (hereafter section 47 or 47(b)) with a provision found in Penal Code section 11172, subdivision (a) (hereafter section 11172 or 11172(a)) that permits the recovery of damages for false reports of child abuse.

Although other courts have addressed this issue in the context of third parties making false reports of child abuse, the issue presented in this case,

possible civil liability when a *victim* reports alleged abuse to the police, is one of first impression. We conclude section 11172 does not apply in this situation, and that Monroy's statements were absolutely privileged. Our conclusion compels the reversal of the order of the trial court.

## FACTUAL AND PROCEDURAL SUMMARY

Monroy's motion to strike was directed at Chabak's second amended complaint, which contained two causes of action. The first cause of action alleged that Monroy falsely reported to the police and to her parents that Chabak had abused her. According to Chabak, these false statements subjected Monroy to damages pursuant to section 11172. The second cause of action alleged these false statements were slanderous.

This summary of facts was drawn from the evidence filed in support of, and in opposition to, the motion to strike. Monroy explained in her declaration filed in support of her motion to strike that she sought treatment from Chabak, a physical therapist, for sports-related injuries to her legs in 2003–2004 when she was a 17-year-old high school student. The massages she received from Chabak were different from the massages she received from Chabak's other employees, and this made Monroy uncomfortable. During treatment sessions, Chabak would make comments and jokes that Monroy thought were inappropriate, some with a sexual theme. One time Chabak pinched Monroy's buttocks during treatment. He also massaged the upper part of Monroy's legs in a manner Monroy thought inappropriate. Monroy stopped seeing Chabak for therapy after Chabak pinched her buttocks.

Monroy did not report these incidents to the police immediately because she was embarrassed. Monroy became concerned, however, when Chabak unexpectedly stopped at a meeting of the local police explorers, of which she was a member. Chabak asked for Monroy when he arrived at the meeting. Monroy had told Chabak she was a member of the group, but she did not invite him to the meeting. Chabak's appearance at the meeting caused Monroy additional concern and prompted her report to the police.

Monroy gave a statement to the Coalinga Police investigator regarding Chabak's behavior during her therapy appointments. She told her mother about Chabak's behavior after being encouraged to do so by the police officer who took her report.

Various police reports were submitted to the trial court, both in support of and in opposition to the motion to strike. The summary of the investigating officer's interview of Monroy reviewed the history of Monroy's injury and treatment. Monroy also discussed Chabak's inappropriate comments during therapy appointments. Monroy told the investigator that when Chabak was massaging her legs, he would put a towel over her to protect her privacy. Chabak would tuck the towel into the top of Monroy's underwear. During her last treatment session, Chabak pinched her on the buttocks twice (through her clothing and the towel). Monroy admitted speaking to the police and to her mother about the incident. The reports also indicated the investigating officer contacted the state authorities responsible for licensing physical therapists.

Chabak submitted a declaration in opposition to the motion to strike, denying that he had pinched Monroy's buttocks, acted inappropriately, or touched her in a manner inconsistent with therapeutic needs.

In her discovery responses, filed in opposition to the motion to strike, Monroy admitted that she told her mother, father, and law enforcement that Chabak pinched her buttocks and made inappropriate comments during therapy appointments. In a supplemental response to interrogatories, Monroy identified Julia Mitchell as another person she told about the above incidents. Mitchell later was identified as the individual who assisted Monroy in preparing a petition to prohibit civil harassment and in seeking a preliminary injunction to stop Chabak from harassing her.

This evidence establishes that Monroy told law enforcement officers, her mother, her father, and a paralegal, who assisted Monroy in filing a motion in court, about Chabak's conduct. The evidence also establishes that Chabak denied all of Monroy's accusations. This is the extent of the relevant evidence in the record.[1]

The trial court denied the motion to strike, holding that while Monroy's statements were the type of speech protected by section 425.16, Chabak sufficiently had pled a prima facie case of liability.

---

[1] The record also contains a tremendous amount of material, including discovery disputes, all reflecting the extreme emotional embroilment of the parties and counsel and none pertinent to the narrow issue to be resolved by us. Chabak also seeks to submit additional evidence with his brief. We, of course, are constrained to the relevant evidence before the trial court at the time of the decision being challenged here.

# DISCUSSION

## I. *The Special Motion to Strike*

The special motion to strike, also known as an anti-SLAPP motion, was the Legislature's response to a perceived increase in lawsuits aimed at chilling the exercise of free speech. These lawsuits generally are referred to as SLAPP suits, or strategic lawsuits against public participation. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85, fn. 1 [124 Cal.Rptr.2d 530, 52 P.3d 703].) Section 425.16 is known as the anti-SLAPP statute. (*Navellier*, at p. 84.)

█ " 'The Legislature enacted section 425.16 to prevent and deter "lawsuits . . . brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target.' " [Citation.] Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' [Citations.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278 [46 Cal.Rptr.3d 638] (*Soukup*).)

The special motion to strike established in section 425.16 may be used to attack a cause of action if (1) the cause of action arises from "any act [by the defendant] in furtherance of the person's right of petition or free speech under the United States or California Constitution," and (2) the defendant was exercising his or her right of free speech "in connection with a public issue." (*Id.*, subd. (b)(1).) If the moving defendant establishes those two elements, the burden shifts to the plaintiff to establish there is a probability he or she will prevail on the cause of action. (*Id.*, subd. (b)(1), (2); *Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1400 [53 Cal.Rptr.3d 647].)

The trial court reviews the pleadings and the admissible evidence contained in the declarations to determine if the parties have met their burdens of proof. (§ 425.16, subd. (b)(2); *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 26 [53 Cal.Rptr.3d 752].) The motion may be granted only if the cause of action arises from protected activity and the plaintiff cannot establish a probability of prevailing on the merits. (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89.)

An order denying a section 425.16 motion is an appealable order. (Code Civ. Proc., §§ 425.16, subd. (i), 904.1, subd. (a)(13).) We review the trial court's ruling on a section 425.16 motion de novo. (*Gilbert v. Sykes, supra,* 147 Cal.App.4th at p. 22.) "We exercise our independent judgment to determine not only whether the anti-SLAPP statute applies, but whether the complainant has established a reasonable probability of prevailing on the merits. [Citation.]" (*Ibid.*) "However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup, supra,* 39 Cal.4th at p. 269, fn. 3.)

We will apply these concepts to Chabak's second amended complaint.

## II. *Analysis*

Chabak's first cause of action is entitled "False Report of Child Abuse (California Penal Code section 11172)." The second cause of action is for slander. Both causes of action are based on Monroy's statements to the police and her parents regarding what she termed Chabak's inappropriate conduct.

It is questionable whether section 11172 provides a separate right of recovery, or merely grants qualified immunity to those reporting child abuse. This statute is part of the Child Abuse and Neglect Reporting Act (Pen. Code, § 11164 et seq.) that, as its name implies, is a comprehensive scheme to encourage, and in some cases require, individuals who suspect a child is the victim of either abuse or neglect to report their suspicions to designated authorities. (Pen. Code, § 11165.9.)

Section 11172 provides immunity to individuals who report child abuse to the proper authority. This immunity is absolute for mandated reporters and qualified for other individuals who report child abuse (voluntary reporters). A voluntary reporter faces potential liability for reporting potential child abuse only if it is proven that "a false report was made and the person knew that the report was false or [made the report] with reckless disregard of the truth or falsity of the report." (§ 11172(a).) "[A]ny person who makes a report of child abuse or neglect known to be false or with reckless disregard of the truth or falsity of the report is liable for any damages caused." (*Ibid.*)

We have not located any case that suggests that damages may be recovered simply because a false report of child abuse was made. It seems that if a voluntary reporter of child abuse knowingly makes a false report, then the plaintiff may seek recovery for damages under whatever theory is applicable to the facts of the case (defamation, for example), but not simply because a

false report was made. By providing for recovery of any damages caused, it would appear the Legislature was anticipating recovery of damages under existing theories of liability, not creating a new theory of recovery. The cases we have reviewed are consistent with this approach, although they do not address this specific issue. (See, e.g., *Begier v. Strom* (1996) 46 Cal.App.4th 877 [54 Cal.Rptr.2d 158]; *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563 [31 Cal.Rptr.3d 368] (*Siam*).)

As will be seen, the resolution of this issue is unnecessary here.

### A. *"Arising From" Protected Activity*

The first step in the section 425.16 analysis requires that we determine if the cause of action asserted by the plaintiff arose from protected activity by the defendant. "[T]he statutory phrase 'cause of action . . . arising from' means simply that the defendant's act underlying the plaintiff's cause of action must *itself* have been an act in furtherance of the right of petition or free speech. [Citation.] In the anti-SLAPP context, the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.] 'A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subdivision (e) . . . .' [Citations.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].)

Chabak's cause of action is based on Monroy's reporting to the Coalinga Police Department that she felt Chabak touched her inappropriately, and then repeating these statements to her parents at the urging of the investigating officer. Chabak argued in the trial court that Monroy also repeated these statements to her friends, but there is no evidence in the record to support these assertions.

In the trial court, Chabak argued that while the report to the police arguably may have fallen within the definition of the right to petition the government, the statements to her parents did not. Chabak does not cite any authority for this proposition.

Monroy's statements to the police clearly arose from protected activity, as is established by the case on which Chabak, and ultimately the trial court, relied. In *Siam, supra*, 130 Cal.App.4th 1563, Kizilbash reported to the police and other authorities that Siam had molested Kizilbash's children. Kizilbash and his wife were divorced. Siam was her new companion.

Siam sued Kizilbash for various torts, including defamation, infliction of emotional distress, and malicious prosecution. Kizilbash made a special motion to strike the complaint pursuant to section 425.16, which the trial court denied.

■ The appellate court began by considering whether Kizilbash's conduct in reporting abuse to investigative authorities arose from protected speech. (*Siam, supra*, 130 Cal.App.4th at pp. 1569–1570.) The appellate court concluded that reports of child abuse to individuals bound by law to investigate the report are protected by section 425.16, i.e., the statements arose from protected activity (the right to petition the government). (*Siam*, at p. 1570.)

We have found no case that reaches a different conclusion, and Chabak has not cited any case on the issue. We agree with the conclusion in *Siam*. Monroy's statement to the police arose from her right to petition the government and thus is protected activity.

The next issue is whether Monroy's statements to her parents also are protected activity. The parties have not cited, nor has our independent research located, a case that addresses this issue.

■ Under the facts of this case, we conclude these reports were directly related to Monroy's reports to the police and are protected activity. First, Monroy was a minor at the time she reported the incident to the police. Second, she was instructed by the investigating officer to report the incident to her mother. Third, in the event that Monroy sought any type of civil remedy against Chabak before her 18th birthday, she would have been required to obtain a guardian ad litem (Code Civ. Proc., § 372, subd. (a)), which is generally the minor's parent. Finally, it seems to us almost impossible to avoid the involvement of Monroy's parents in the subsequent criminal investigation of Chabak. Since disclosure was required, we agree with the local authorities that Monroy was the best person to do so. For all of these reasons, we agree with the trial court that "In light of the special and protective nature of the relationship between parent and a minor child, it is absurd to say that a right or protection otherwise extended to the minor is forfeited or lost merely because the minor confided in his or her parent."

B. *Probability of Prevailing on the Merits*

■ The second step in our analysis requires us to determine whether Chabak established a probability of prevailing on the merits. "To meet this burden, [the plaintiff] must ' "demonstrate the [complaint] is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a

favorable judgment if the evidence submitted by the plaintiff is credited."
[Citation.] "The burden on the plaintiff is similar to the standard used in
determining motions for nonsuit, directed verdict, or summary judgment." '
[Citation.]" (*Gilbert v. Sykes, supra*, 147 Cal.App.4th at p. 26.) Thus, "The
plaintiff need only establish that his or her claim has 'minimal merit'
[citation] to avoid being stricken [pursuant to section 425.16]. [Citation.]"
(*Soukup, supra*, 39 Cal.4th at p. 291.) Chabak must meet this burden with
" 'competent and admissible evidence.' [Citations.]" (*Gilbert*, at p. 26.)

The trial court concluded Chabak successfully met his burden by providing
evidence that Monroy made the above statements and through his denial of
any wrongdoing. Because the moving plaintiff's burden is minimal, we agree
with the trial court's conclusion regarding Chabak's evidence.

This conclusion, however, does not end our inquiry. Even if the plaintiff
presents sufficient evidence to support his or her prima facie case, we still
must determine whether the moving defendant can establish the plaintiff
cannot prevail as a matter of law, typically through establishing an affirmative
defense to plaintiff's claims. (*Siam, supra*, 130 Cal.App.4th at p. 1570.)

Whether Monroy can establish an affirmative defense to Chabak's com-
plaint is the primary issue in this case. Monroy argues Chabak cannot recover
because her statements were privileged. (§ 47(b).) Monroy's argument requires
us to reconcile the litigation privilege found in Civil Code section 47, with the
exception to the qualified immunity provided in Penal Code section 11172.

■ Section 47 provides that certain publications or broadcasts are privi-
leged. The privilege attaches if the statement is made in the proper discharge
of an official duty (*id.,* subd. (a)), or in any legislative, judicial, or other
official proceeding authorized by law (*id.,* subd. (b)), subject to certain
exceptions that are not applicable to this case. A qualified privilege exists
for communications made between interested persons (*id.,* subd. (c)), and
reports of judicial, legislative, or official proceedings or public meetings
(*id.,* subds. (d)(1), (e)).

The litigation privilege was discussed in *Hagberg v. California Federal
Bank* (2004) 32 Cal.4th 350 [7 Cal.Rptr.3d 803, 81 P.3d 244] (*Hagberg*).
Hagberg attempted to cash a check at California Federal Bank (the bank).
Employees of the bank erroneously believed the check was counterfeit and
reported the matter to the police. Officers responded to the scene and detained
Hagberg for approximately 20 minutes before releasing her. Hagberg sued the
bank and various individuals, alleging several causes of action, including
claims for racial discrimination, false arrest, false imprisonment, and slander.
(*Id.* at pp. 356–357.) The trial court granted the bank's motion for summary

judgment, which was affirmed on appeal. (*Id.* at p. 358.) Both courts concluded the statements to the police by bank employees were absolutely privileged pursuant to section 47(b). (*Hagberg*, at p. 358.)

The Supreme Court agreed and explained that the absolute privilege found in section 47(b) bars all tort causes of action, except for a claim of malicious prosecution. (*Hagberg, supra*, 32 Cal.4th at p. 358.) "[T]he absolute privilege established by section 47(b) serves the important public policy of assuring free access to the courts and other official proceedings. It is intended to ' "assure utmost freedom of communication between citizens and *public authorities whose responsibility is to investigate and remedy wrongdoing.*" ' [Citation.] We have explained that both the effective administration of justice and the citizen's right of access to the government for redress of grievances would be threatened by permitting tort liability for communications connected with judicial or other official proceedings. Hence, without respect to the good faith or malice of the person who made the statement, or whether the statement ostensibly was made in the interest of justice, 'courts have applied the privilege to eliminate the threat of liability for communications made during all kinds of truth-seeking proceedings: judicial, quasi-judicial, legislative and other official proceedings.' [Citation.]" (*Id.* at pp. 360–361.) The Supreme Court concluded that these policies would best be served by applying the absolute privilege in section 47(b) to reports made to the police about a possible crime. (*Hagberg*, at p. 364.)

Monroy is in the same position as the bank employees in *Hagberg*. Her statements to the police were absolutely privileged pursuant to Civil Code section 47(b). This presents a direct conflict with Penal Code section 11172, which permits recovery of damages for false reports of child abuse.

An almost identical issue was presented in *Siam*. As discussed, *ante*, Siam sued Kizilbash for various torts as a result of Kizilbash's reports to the authorities that Siam was abusing Kizilbash's children. Kizilbash moved to strike the complaint, arguing his reports were absolutely privileged by section 47(b).

After rejecting several constitutional challenges to section 11172, the appellate court discussed the conflict between the two statutes. The appellate court held, consistent with *Begier v. Strom, supra*, 46 Cal.App.4th at page 885, that section 11172 created an exception to the litigation privilege. (*Siam, supra*, 130 Cal.App.4th at p. 1577.) In reaching its conclusion, the appellate court rejected Kizilbash's reliance on *Hagberg*. "There is . . . nothing in the Supreme Court's discussion that casts doubt upon the validity of Penal Code section 11172(a) or upon the conclusion of *Begier* [*v. Strom,*] *supra*, 46 Cal.App.4th 877 that the liability it imposes upon voluntary reporters overrides the litigation privilege." (*Siam*, at p. 1577.)

We agree with the conclusions reached in *Siam*, but that does not resolve the issue presented in this case. Chabak is suing the *victim* of the alleged abuse, not a third party who reported the abuse. The question we must resolve is whether the exception to the immunity provided in section 11172 applies to the person claiming to be the victim of the abuse.

We begin by observing that section 11172 is part of the Child Abuse and Neglect Reporting Act (the Act). (Pen. Code, § 11164 et seq.) "The intent and purpose of [the Act] is to protect children from abuse and neglect. In any investigation of suspected child abuse or neglect, all persons participating in the investigation of the case shall consider the needs of the child victim and shall do whatever is necessary to prevent psychological harm to the child victim." (Pen. Code, § 11164, subd. (b).)

The statutory scheme requires individuals in specific professions, such as teachers, social workers, and physicians, to report to the appropriate investigating agencies whenever they suspect a child has been abused. (Pen. Code, §§ 11165.7, 11165.9.) Reports must be made following strict guidelines established by the Legislature. (Pen. Code, § 11166.) There are criminal sanctions for a mandatory reporter who willfully fails to report suspected abuse if the child suffers great bodily injury or death. (Pen. Code, § 11166.01, subd. (b).)

As is obvious from this short review, the Legislature addressed a specific problem—the failure of individuals who are in a position to suspect a child is being abused or neglected to report their suspicions to the investigating authorities. Indeed, although certain volunteers who are not mandated reporters are encouraged to obtain training in identifying and reporting child abuse (Pen. Code, § 11165.7, subds. (b), (f)), and are provided qualified immunity (§ 11172(a)), the vast majority of the provisions in the Act are directed at mandatory reporters. Nothing in the Act is directed at *the victims of abuse*.

Since the Act is directed at third party reports of abuse, is the liability permitted by section 11172(a) intended to include victims of child abuse? Chabak relies on the following sentence from section 11172(a): "Any other person [other than a mandated reporter] reporting a known or suspected instance of child abuse or neglect shall not incur civil or criminal liability as a result of any report authorized by this article unless it can be proven that a false report was made and the person knew that the report was false or was made with reckless disregard of the truth or falsity of the report, and any person who makes a report of child abuse or neglect known to be false or with reckless disregard of the truth or falsity of the report is liable for any damages caused." He argues the term "any other person" includes alleged victims of child abuse.

■ We think Chabak is focusing on the wrong phrase. The qualified immunity granted in section 11172, and the liability imposed for false reports of child abuse, are limited to "any report authorized by" the Act. The reports "authorized by" the Act are the reports made by mandatory reporters or voluntary reporters who are reporting their observations. We do not think the Legislature intended to include the reports made by alleged victims of abuse as a report authorized by the Act. To conclude otherwise would destroy the main purpose of the Act. By subjecting the child victim of abuse to civil liability for reporting the abuse to the police would not "protect children," nor would it "prevent psychological harm to the child victim." (Pen. Code, § 11164, subd. (b).)

Since the term "any report authorized by" the Act may be ambiguous, we have reviewed the legislative history of section 11172 to determine the apparent intent of the Legislature. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 273 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) We find support for our conclusion in this history, albeit not directly. Senate Bill No. 781 (1979–1980 Reg. Sess.), which eventually was signed into law (Stats. 1980, ch. 1071, § 4, pp. 3420–3426), contains only two items that could be construed as references to the qualified immunity provision of the bill.[2] The first item is a letter dated February 20, 1980, from the State Bar Committee on Juvenile Justice to Senator Omer L. Rains, the author of Senate Bill No. 781.[3] The original version of Senate Bill No. 781, as introduced March 23, 1979, provided absolute immunity for all individuals who reported a suspected instance of child abuse. In its letter of February 20, 1980, the Committee on Juvenile Justice stated that it could not support Senate Bill No. 781 because, among other reasons, the bill would allow "third persons (e.g., a vindictive neighbor or relative) to make a malice-based report and be totally immune from civil or criminal liability."

The second item in the legislative history is an undated document from the State Bar regarding Assembly Bill No. 2497 (1979–1980 Reg. Sess.), the companion to Senate Bill No. 781 (1979–1980 Reg. Sess.), circulated in the Assembly.[4] In this document, the author states that providing only qualified immunity to voluntary reporters "is necessary to prevent a vindictive former spouse or neighbor from making a knowingly false report."

---

[2] This legislative history contains several documents concerned with civil and criminal liability for failure to report suspected child abuse, an issue with which we are not concerned in this appeal. This focus, however, demonstrates again the intent of the Legislature to increase the reporting of child abuse by third party observers. It would be absurd to suggest the Legislature intended to impose civil or criminal liability on a victim of abuse for failing to report that abuse.

[3] Legislative history material provided by Legislative Intent Service.

[4] See footnote 3, *ante.*

The version of Senate Bill No. 781 (1979–1980 Reg. Sess.) signed into law contains the qualified immunity for voluntary reporters in a form that is substantially identical to its present version. From these documents we can infer that qualified immunity was provided for voluntary reporters to address the concern that vindictive neighbors or relatives might make false reports to create problems for the custodial parent of the child. None of these documents, or anything else in the legislative history of Senate Bill No. 781, supports Chabak's argument that victims who report they have been abused should be exposed to civil liability.

We also find support for our analysis in the theme repeatedly expressed in the legislative history for Senate Bill No. 781 (1979–1980 Reg. Sess.). The problem the Legislature was addressing was the failure of individuals who were in a position to suspect child abuse to report their suspicions to appropriate authorities. For example, the Assembly Committee on Criminal Justice held an interim hearing on November 21, 1978, on the issue of child abuse reporting. This hearing was held in anticipation of Senator Rains's bill on child abuse reporting, which ultimately became Senate Bill No. 781. Deputy Attorney General Michael Gates addressed the committee at the hearing. The Attorney General's Office was a proponent of the need for legislation regarding child abuse reporting. Deputy Attorney General Gates explained the Attorney General's position on the need for enhanced reporting requirements: "And the other concern that we had . . . in making or drafting a responsible law where people could follow it, and where there would not be as much under-reporting as there [currently] is, is the very fact that these children are the most vulnerable victims of society who are in most cases incapable of reporting themselves . . . . Therefore, we have to rely on third parties reporting child abuse who come into contact with children and are able to observe potential injuries and potential cases of child abuse. So, it is imperative that third parties report, and it is imperative that they report completely and not just subjectively or let their own philosophy interfere with [their] legal duties."

The statutory scheme enacted into law, as well as the legislative history supporting that scheme, establishes that the Legislature was seeking to increase the reporting of suspected child abuse, which in turn would permit the appropriate authorities to investigate the suspected abuse. The ultimate goal of this statutory scheme was to protect children from abuse. It would not aid either goal to impose civil liability on victims of child abuse. These goals, along with the complete absence of anything in the legislative history suggesting otherwise, compel our conclusion that the phrase "any report authorized" by the Act is limited to reports made by third parties about suspected instances of child abuse. The reports authorized by the Act do not include reports by individuals who claim to be victims of child abuse.

We also find support for our conclusion in the legislative history of another statute. In 1981 Assembly Bill No. 42 (1981–1982 Reg. Sess.) was signed into law and added section 48.7 to the Civil Code. (Stats. 1981, ch. 253, § 1, p. 1314.) This section provides that a person charged with child abuse may not bring a civil action for libel or slander against the victim, the victim's parents, or any witness for statements made by the minor that are "reasonably believed to be in furtherance of the prosecution of the criminal charges while the charges are pending before a trial court." (Civ. Code, § 48.7, subd. (a).)

On its face, it would seem that Civil Code section 48.7 contradicts our conclusion regarding Penal Code section 11172 in that it appears to permit a defamation action once criminal proceedings are concluded.

The legislative digest to Assembly Bill No. 42 (1981–1982 Reg. Sess.), however, proves otherwise. The legislative digest confirms that communication from the victim of the abuse to the police is privileged. "Existing law does not prohibit a person charged with child abuse from bringing a civil libel or slander action against the minor, a parent or guardian of the minor, or a witness. *However, there is no liability for libel or slander based on a privileged communication, including a communication intended to initiate or further an official proceeding such as a criminal prosecution.*" (Italics added.) (Legis. Counsel's Dig., Assem. Bill No. 42 (1981–1982 Reg. Sess.) 4 Stats. 1981, Summary Dig., pp. 73–74; see also *Hagberg, supra,* 32 Cal.4th at pp. 370–372, fn. 6.)

Since the Legislature enacted Assembly Bill No. 42 (1981–1982 Reg. Sess.) less than one year after the qualified immunity provision found in section 11172, this legislative digest comment supports our conclusion that the Legislature did not intend to abrogate the litigation privilege that protects statements from the purported victim of abuse to the police investigating that report.

Finally, we do not believe the Legislature intended to impose civil liability on minor victims that would not exist if the victim were an adult. If Monroy falsely reported to the police that Chabak touched her inappropriately when she was 18, her statements would be absolutely privileged. (*Hagberg, supra,* 32 Cal.4th at p. 364.) The qualified immunity and potential for damages for false reports found in section 11172 would not apply because the statute is limited to reports of *child abuse* and, in our hypothetical, Monroy was 18 when the events occurred.[5] If we interpreted section 11172 as suggested by Chabak, only *minor victims,* not adult victims, who falsely alleged they were

---

[5] For the purposes of the Act, a " 'child' means a person under the age of 18 years." (Pen. Code, § 11165.)

abused would be subject to civil liability. There is nothing in the statute, legislative history of the statute, or the cases discussing the Act that would support such an absurd result.

■ Our conclusion that Civil Code section 47 is not superseded by Penal Code section 11172 when the victim reports he or she allegedly has been abused means that Chabak cannot establish a prima facie case because Monroy's comments to the police were absolutely privileged.

■ Monroy's comments to her parents and her paralegal also were protected by the absolute privilege of section 47(b). As the Supreme Court explained in *Hagberg*, "Many cases have explained that section 47(b) encompasses not only testimony in court and statements made in pleadings, but also statements made prior to the filing of a lawsuit, whether in preparation for anticipated litigation or to investigate the feasibility of filing a lawsuit. [Citation.] As we have said, 'it is late in the day to contend that communications with "some relation" to an *anticipated* lawsuit are not within the privilege.' [Citation.] Rather, the privilege applies to 'any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom [when] no function of the court or its officers is involved.' [Citations.] We have noted the application of the privilege to communications with ' "some relation to a proceeding that is . . . under serious consideration;" ' to ' "potential court actions;" ' and to ' "preliminary conversations and interviews related to contemplated action," ' and we also have determined that the privilege applies to communications made, prior to the filing of a complaint, by a person 'meeting and discussing' with potential parties the 'merits of the proposed . . . lawsuit.' [Citation.]" (*Hagberg, supra*, 32 Cal.4th at p. 361.) Monroy's statements to her parents and her paralegal fall within the broad protections of the litigation privilege as communications made in anticipation of litigation.

## CONCLUSION

Monroy's statements that are the subject of the second amended complaint were absolutely privileged pursuant to the provisions of Civil Code section 47, subdivision (b). Because Monroy was the purported victim of abuse, the qualified immunity and potential liability for damages found in Penal Code section 11172, subdivision (a) for voluntary reporters are inapplicable. The trial court, thinking it was compelled by *Siam, supra*, 130 Cal.App.4th 1563 and *Begier v. Strom, supra*, 46 Cal.App.4th 877, ruled otherwise. In doing so, the trial court erred.

## DISPOSITION

The order denying the special motion to strike is vacated, and the trial court is directed to enter a new order granting the motion. Monroy is awarded her costs on appeal.

Vartabedian, Acting P. J., and Wiseman, J., concurred.