Filed 11/3/22  Barth v. City of Chino CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| ROBIN BARTH, | |
| Plaintiff and Appellant, | E077529, E078175 |
| v. | (Super.Ct.No. CIVSB2104627) |
| CITY OF CHINO et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of San Bernardino County. Thomas S. Garza, Judge. Affirmed.

Mahoney & Soll, Paul M. Mahoney, and Richard A. Soll for Plaintiff and Appelllant.

Silver & Wright, Matthew R. Silver, and Valerie D. Escalante Troesh for Defendants and Respondents.

Plaintiff Robin Barth appeals from a judgment of dismissal following the grant of a special motion to strike under Code of Civil Procedure section 425.16 (the anti-SLAPP statute).[1] In 2019, the City of Chino filed an abatement action against Barth, alleging his unpermitted cement mixing business violated zoning and nuisance laws. As part of that lawsuit, a city code enforcement officer conducted weekly investigations of Barth's business from the street or other public rights-of-way.

In February 2020, the code enforcement officer called 911 to report that Barth had threatened him during an official inspection and was chasing him through the city streets. The police investigated the incident, determined there was probable cause to believe Barth had issued a criminal threat, and arrested him. Though the district attorney's office ultimately didn't file charges, the city successfully obtained a restraining order against Barth in a civil suit, followed by a preliminary injunction against him in the abatement action.

Months after the restraining order was issued, Barth filed this lawsuit, suing the city, the code enforcement officer, and the investigating police officer (collectively, Chino) for false arrest and intentional and negligent infliction of emotional distress. Chino countered with an anti-SLAPP motion, asserting the lawsuit targeted their First Amendment right to petition the government. The trial judge agreed and granted the motion as to all three causes of action.

---

[1] Unlabeled statutory citations refer to the Code of Civil Procedure.

2

In two separate appeals, which we have consolidated, Barth challenges the anti-SLAPP ruling and the order awarding Chino attorney fees as prevailing parties under section 425.16, subdivision (c).[2] We affirm.

# I

# FACTS

We draw the facts from Barth's complaint and the admissible evidence submitted with the anti-SLAPP briefing. (*Chabak v. Monroy* (2007) 154 Cal.App.4th 1502, 1509 (*Chabak*).)

A.   *The Incident, Investigation, and Arrest*

Barth operates his cement mixing business, First Choice Ready Mix Corporation, from a property he leases on McCarty Road in Chino. In October 2019, after various notices and cease-and-desist letters went ignored, Chino filed an abatement action against him, alleging his business operations violated zoning laws and created a public nuisance. As part of its investigation, Chino assigned Mark Ilagan, a code enforcement officer of 16 years, to conduct a weekly "public right-of-way" inspection, during which Ilagan would observe Barth's operations from the street in a marked, city-issued vehicle and video any violations he observed. The inspections lasted about 10 to 20 minutes, and Ilagan never went onto the property or spoke with Barth's employees.

---

[2] Case Numbers E077529 and E078175.

According to Ilagan, as he was finishing an inspection from his car on the morning of February 24, 2020, Barth drove up in a truck and blocked him in. Barth rushed over to the driver's side of Ilagan's car and demanded to know if he was with the city. When Ilagan said he was, Barth, who was visibly angry at this point, told him he was "sick and tired" of the constant harassment. Assuming a fighting stance, he exclaimed, "I will go postal and that is not a threat—it's a promise!" Ilagan asked, "On who? Are you talking about me?" and Barth said he was "going to go postal on the City and the City Attorney's office." Ilagan asked him what "going postal" meant, and he said, "What mail carriers do." Ilagan said, "you mean shoot people?" and Barth reiterated "this is not a threat but a promise."

Worried Barth was armed, Ilagan put his car in reverse and quickly drove off, while Barth jumped in his truck and followed him, aggressively tailing him and honking. Afraid Barth might shoot him if he was able to pull up alongside him, Ilagan drove recklessly, cutting off a big rig and running a stop sign in an attempt to shake his pursuer. When he thought he'd lost Barth, he pulled to the side of the road to call 911. While on the phone with dispatch, Ilagan heard honking and saw Barth had caught up with him and parked behind him. Ilagan took off, and, afraid for his safety, drove to the police station, where he reported the entire incident to an officer and identified Barth in a photographic lineup.

Later that afternoon, Detective Beckman went to Barth's home to talk to him about the incident. Barth said city employees had been harassing him about his business, adding, "They're like the 'postal' guy, they come every day, don't take this the wrong way." He said he had confronted a code enforcement officer in front of his plant that morning, and they had "got into it," but he never actually threatened the officer. He said the officer had misinterpreted his reference to the "post man" as a threat he would "go postal." Barth also denied following the officer in his truck, claiming he had simply left at the same time as the officer to run an errand. Barth claimed he'd never seen that particular code enforcement officer before and that he wasn't the one who usually inspected his business.

After determining there was probable cause to arrest Barth on a criminal threats charge, Detective Beckman took him to the police station, where he agreed to another interview. During the second interview, Barth gave a more detailed account of the incident, one that contradicted various aspects of his earlier account, including his previous statement that he hadn't known who Ilagan was when he confronted him. In addition, this time Barth admitted he'd said the phrase "I'm going postal," but claimed he had made it clear he wasn't talking about shooting anyone. He said he'd told Ilagan repeatedly that he wasn't threatening him.

When Barth asked for an attorney about 40 minutes in, Detective Beckman ended the interview and transported him to the West Valley Detention Center for processing. The record does not indicate how long Barth was in custody before he posted bail.

5

On March 6, 2020, Chino sought a temporary restraining order against Barth, which the court issued on March 10, concluding Chino demonstrated that Barth posed a "credible threat of violence or stalking." About two months later, Barth received a letter from Chino's Chief of Police informing him that the district attorney had decided not to file charges.

B.     *The Lawsuit and Anti-SLAPP Motion*

In August 2020, Barth submitted a tort claim to the city for false imprisonment and defamation, alleging he had sustained $10 million in damages as a result of Ilagan's false statements to the police and his resulting arrest. The city denied Barth's claim, and in March 2021, he filed a lawsuit seeking over $25,000 in damages against the city, Ilagan, and Beckman.

In a complaint almost entirely devoid of factual allegations, Barth asserted three causes of action—false arrest, intentional infliction of emotional distress, and negligent infliction of emotional distress. To support these claims, he asserted simply that Ilagan had made "false allegations" to the police, and Detective Beckman had arrested him "without probable cause" and "question[ed] him without an attorney." He alleged this conduct was extreme and outrageous and claimed he suffered "several nervous breakdowns, and severe physical and emotional distress" as a result of being framed and arrested without probable cause.

On May 4, 2021, before Chino responded to the complaint, the trial court in the abatement action issued a preliminary injunction directing Barth to either cease operations or bring them into compliance with zoning and permitting laws. That same month, the trial court in the city's civil harassment suit denied Barth's motion to terminate the restraining order against him.

Chino responded to Barth's lawsuit on May 24, 2021, with an anti-SLAPP motion to strike the complaint along with the transcript of Ilagan's 911 call and supporting declarations from Ilagan, the police officer he spoke with at the station, Detective Beckman, and the attorney representing the city in the civil harassment and abatement actions. Chino argued Barth's claims were meritless, retaliatory, and intended to curb civil and criminal investigations and access to the courts.

Ilagan described his run in with Barth and said he understood Barth's words to have an "extremely violent meaning." He said he was terrified throughout the incident that Barth had a gun and was going to shoot him. Officer Piszkiewicz said he found Ilagan's account of the incident highly credible and concluded there was probable cause to investigate whether Barth had issued a criminal threat in violation of Penal Code section 422.

Detective Beckman described his initial interview of Barth and explained why he believed there was probable cause to make an arrest. Among other things, he found it suspicious that Barth had immediately referenced the word "postal" without being asked about it. This suggested to the detective that he was "trying to cover-up or paint a

7

different story than what was reported." Additionally, Detective Beckman found Barth to be "evasive" and "defensive" during the second interview at the police station. He said that interview had lasted about 40 minutes because Barth requested an attorney.

Barth opposed the anti-SLAPP motion and submitted a declaration in which he accused the city of harassing him with the abatement action and accused Ilagan and Detective Beckman of framing him. He said he'd been subjected to "personal harassment and attacks from officials from the City of Chino" since 2019. He described the city's allegations of code violations as baseless and discriminatory because they allowed other cement businesses to run similar operations in the same area.

As for the incident with Ilagan, Barth said *Ilagan* had become belligerent with *him* after he'd told the code enforcement officer, "You should do your job. The postman comes every day and he delivers the mail. Why can't you do your job and fix the pot holes? I will even donate the concrete free of charge to fix the street." Barth said Ilagan became very angry at that point and began "yelling and screaming." Barth tried to diffuse the situation by walking away, but when he got into his truck Ilagan pulled out in front of him and blocked his path for several minutes. When Ilagan finally drove off, Barth drove behind him in the same direction for a while but only because it was on the way to his bank. The police arrived at his house later that day and handcuffed him in front of his daughter. They took him to the station where two detectives interviewed him for "several hours" before throwing him in jail.

On July 26, 2021, San Bernardino County Superior Court Judge Thomas Garza granted the anti-SLAPP motion, concluding Barth's claims targeted activity protected by the First Amendment and were unlikely to succeed on their merits. Specifically, he determined the claims were based upon "statements, writings, and conduct . . . that arise out of the investigation and enforcement of state and local laws prohibiting nuisance activity and criminal conduct and out of the right to petition the government."

## II

## ANALYSIS

Barth argues the judge should have denied the anti-SLAPP motion. He claims arresting someone without probable cause is illegal—and thus unprotected—activity. We conclude the ruling was correct.

A.    *General Principles*

Section 425.16, known as the anti-SLAPP statute, authorizes striking any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue," unless the claimant can show there is a probability she will prevail on the claim. (§ 425.16, subd. (b)(1).) The statute was enacted in "response to a perceived increase in lawsuits aimed at chilling the exercise of free speech." (*Chabak*, *supra*, 154 Cal.App.4th at p. 1509.) Because such lawsuits seek to drain defendants of both energy and resources, the statute was designed to stop SLAPP suits at their start by establishing a threshold, "summary-judgment-like procedure" to

9

evaluate the merits of the lawsuit. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278 (*Soukup*).)

The procedure involves a two-step inquiry. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396 (*Baral*).) Faced with an anti-SLAPP motion, the court first determines whether the defendant has demonstrated the complaint arises from activity the anti-SLAPP statute protects. If the defendant fails to carry this burden, the inquiry ends. But if the defendant demonstrates the lawsuit targets protected activity, the burden shifts to the plaintiff to "'demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.) "In this sense, the anti-SLAPP statute operates like a 'motion for summary judgment in "reverse."'" (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 261.)

"The trial court reviews the pleadings and the admissible evidence contained in the declarations to determine if the parties have met their burdens of proof." (*Chabak*, *supra*, 154 Cal.App.4th at p. 1509.) "The motion may be granted only if the cause of action arises from protected activity and the plaintiff cannot establish a probability of prevailing on the merits." (*Ibid*.) We independently review the trial court's ruling, accepting as true the evidence favorable to the plaintiff and evaluating the defendant's evidence only to determine if they have defeated the plaintiff's evidence as a matter of law. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3; *Flatley v. Mauro* (2006) 39 Cal.4th 299, 325 (*Flatley*).)

10

B. *Step One: Does the Suit Target Protected Activity?*

To encourage participation in matters of public significance, the anti-SLAPP statute "shall be construed broadly." (§ 425.16, subd. (a).) The statute protects certain kinds of speech and conduct. As relevant here, it applies to all claims arising from: (1) any statement made before a legislative, executive, or judicial proceeding; (2) any statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body; and (3) any conduct "in furtherance of the exercise of the constitutional right of petition or . . . free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Barth's complaint is based on two types of misconduct, both of which involve clearly protected activity. He claims Ilagan made "false allegations" about him to the police and claims Detective Beckman arrested him without probable cause and "question[ed] him without an attorney." The filing of a police report is an exercise of the right to petition the government and is therefore protected activity under section 425.16. (*Chabak*, *supra*, 154 Cal.App.4th at pp. 1511-1512, 1519; *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1569-1570, 1583.) Similarly, section 425.16 applies to a police officer's statements and conduct made in the course of a criminal investigation. (*Schaffer v. City and County of San Francisco* (2008) 168 Cal.App.4th 992, 999-1000; *Bradbury v. Superior Ct.* (1996) 49 Cal.App.4th 1108, 1116.)

11

Relying on *Flatley*, Barth attempts to avoid the reach of the anti-SLAPP statute by claiming the act of arresting a person without probable cause falls under the illegality exception to protected speech and conduct. But his reliance is misplaced because the exception applies only to speech or conduct that is *indisputably* illegal—either because "the defendant concedes the illegality of its conduct or the illegality is *conclusively* shown by the evidence." (*Flatley*, *supra*, 39 Cal.4th at p. 316, italics added.) Here, in contrast, Chino maintains they had probable cause to arrest Barth and submitted ample evidence in support of that argument. The only support for Barth's contention is his own, self-serving declaration that Detective Beckman intentionally framed him. However, it's well established that "conduct that would otherwise be protected by the anti- SLAPP statute does not lose its coverage simply because it is *alleged* to have been unlawful." (*Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1545.)

Because Chino demonstrated Barth's complaint targets protected activity, we proceed to the second step in the anti-SLAPP inquiry.

C.      *Step Two: Are the Claims Likely to Succeed on Their Merits?*

Similar to the rules of summary judgment, when assessing whether Barth's claims are likely to succeed on their merits, we do not weigh evidence or resolve conflicting factual claims. Instead, we limit our inquiry to whether he "has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment."

12

(*Baral*, *supra*, 1 Cal.5th at pp. 384-385; see also *Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 593.)

Applying these principles here, we conclude Barth failed to state a legally sufficient claim. Because each of his claims against Ilagan and Detective Beckman—false arrest and intentional and negligent infliction of emotional distress—involve the investigation of a crime, they are barred by doctrines of privilege and immunity.

We start with Ilagan. Each of Barth's claims against him hinge on the allegation he made a false police report. But Civil Code section 47, which protects statements made in any official proceeding authorized by law, "gives all persons the right to report crimes to the police, the local prosecutor or an appropriate regulatory agency, even if the report is made in bad faith." (*Cabesuela v. Browning-Ferris Industries of California, Inc.* (1998) 68 Cal.App.4th 101, 112; see also *Fremont Comp. Ins. Co. v. Superior Court* (1996) 44 Cal.App.4th 867, 875 ["section 47 protects persons who report potential criminal activity to the police or local prosecutor from lawsuits, even if the report is made with malice"].) As such, Ilagan was "absolutely privileged" to report Barth's threats and stalking to the police, *even if*, as Barth alleges, the report was false. (*Cote v. Henderson* (1990) 218 Cal.App.3d 796, 806 [privilege applied to defendant's report of rape to the police and the district attorney].)

The privilege applies to bar all tort actions based on the police report, except malicious prosecution, and for good reason. (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 216.) "'[T]he policy underlying the privilege is to assure utmost freedom of

communication between citizens and public authorities whose responsibility it is to investigate and remedy wrongdoing.' In order for such investigation to be effective, 'there must be an open channel of communication by which citizens can call his attention to suspected wrongdoing.'" (*Williams v. Taylor* (1982) 129 Cal.App.3d 745, 753-754.) That channel would "quickly close" if it could lead to a risk of tort liability. (*Ibid.*)

As for Detective Beckman, each of Barth's claims against him hinge on his statements and conduct during his investigation into Ilagan's report—conduct that is protected by multiple immunity provisions. To name just one, Government Code section 820.2 shields "a public employee" from liability for "an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." This provision applies to police officers, immunizing them from liability arising from investigating crimes and arresting suspects. "As with the decision to investigate, an officer's 'decision to arrest, or to take some protective action less drastic than arrest, is an exercise of discretion for which a peace officer may not be held liable in tort.'" (*Bonds v. State of California ex rel. Cal. Highway Patrol* (1982) 138 Cal.App.3d 314, 321.)

And finally, given that Ilagan and Detective Beckman are immune from tort liability, there is no liability to impute to the city. Under Government Code section 815.2 "a public entity is not liable for an injury resulting from an act or omission of an employee . . . where the employee is immune from liability." (Gov. Code, § 815.2. subd. (b).) All of Barth's claims fail as a matter of law.

14

Because Barth's complaint targets protected activity and lacks merit, we uphold the order granting the anti-SLAPP motion. Given our conclusion, we also reject Barth's derivative challenge to the attorney fee order, as the sole basis for his appeal is Chino's status as the prevailing party.

## III

## DISPOSITION

We affirm the orders granting the anti-SLAPP motion and awarding Chino attorney fees. Chino shall recover their costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

15